### 1557.  LACEY r. HUTCHINSON.

1. It is a good defense to an action on a negotiable promissory note under seal, in the hands of the original payee, that it was executed without any lawful consideration.
2. The common-law courts of England enforced specialties in the absence of consideration, not because the presence of a seal carried with it any presumption of consideration, but because consideration was not essential to an instrument executed with such formality. The doctrine of enforcing a contract because of the formality of its execution is older than the juridic concept of consideration as an element of a binding promise.
3. The courts of equity recognize consideration as an essential element of all contracts, with but few exceptions, and do not recognize formality of execution as a substitute therefor. Hence lack of consideration is a good defense in equity to a contract under seal.
4. A negotiable promissory note under seal is a legal hybrid unknown to the common law.
5. In this State an equitable defense not involving affirmative relief or extraordinary remedy may be filed to any action at law in any of the courts. Hence, to an action in a city court on a note under seal, the defense of lack of consideration may be successfully pleaded.

Complaint, from city court of Abbeville—Judge Nicholson. November 11, 1908.

Submitted January 28,—Decided March 23, 1909.

*Land & Hall,* for plaintiff in error.  *Hal Lawson,* contra.

POWELL, J. The plaintiff sued upon a negotiable promissory note under seal. The defendant filed a plea showing in substance that the note was wholly lacking in consideration. The court refused to allow the defendant to introduce testimony tending to support his plea; and the sole question before this court is whether total lack of consideration is a good defense to a negotiable promissory note under seal.

It has frequently been held that failure of consideration, total or partial, is a good defense to such an instrument in this State. It has been held that fraud in the procurement may also be pleaded to such an instrument (*House* v. *Martin,* 125 *Ga.* 643, 54 S. E. 735) ; but it is said in the case of *Slaton* v. *Fowler,* 124 *Ga.* 955 (53 S. E. 567), that it is an open question in Georgia whether the common-law rule which forbade inquiry into consideration, in a suit based on a specialty, is applicable to promissory notes under seal to such an extent as to forbid recognition of a plea

of total absence or want of consideration; and this precise point has not been decided subsequently. There is no question but that the presence of a seal raises a prima facie presumption that it is founded upon a consideration. *Weaver* v. *Cosby,* 109 *Ga.* 313 (34 S. E. 680); *Rutherford* v. *Baptist Convention,* 9 *Ga.* 54; *Smith* v. *Smith,* 36 *Ga.* 184 (91 Am. D. 761).

We have made a painstaking and careful search of the decisions of our Supreme Court, and in no case has the right to plead a total want of consideration to a negotiable promissory note under seal been denied, except by way of obiter. There is a case (*Beazley* v. *Gignilliat,* 61 *Ga.* 187) in which the opinion expressly recites that the promissory note involved was under seal, and yet the judgment of the court below was reversed for refusing to allow the defendant to file a plea of lack of consideration. This is a full bench decision, but it does not seem to have been cited in any subsequent case. It would probably be subject to the criticism that it is a physical precedent only (as the section of the code on the subject of instruments under seal is not noticed), were it not for the fact that Chief Justice Warner, who wrote the opinion, cited the case of *Albertson* v. *Halloway,* 16 *Ga.* 377. In the case last cited (which was decided, however, prior to the adoption of our code) it was said by the court: "We believe that the rule, that a plea of failure of consideration can not be used as a defense to a specialty, applies to no other instruments, save such as were known to the common law as specialties; as deeds, bonds and instruments executed with like solemnities of sealing and delivery. It has been common for courts to say that such defense can not be set up to an *instrument* under seal. But we think that these words were used, or should have been used, with reference to such instruments as were executed with the ceremonies necessary to specialties at common law." In *Sivell* v. *Hogan,* 119 *Ga.* 169 (46 S. E. 67), there is a somewhat lengthy review of the authorities by Justice Cobb, and the intimation of a personal opinion that a plea of original lack of consideration would not be a good defense to a suit based on a contract under seal; though the court very frankly states that what is said on this subject is obiter.

The Civil Code, §3656, provides: "A consideration is essential to a contract which the law will enforce? An executory contract, without such consideration, is called a nudum pactum, or a naked

promise. In some cases a consideration is presumed, and an averment to the contrary will not be received. Such are generally contracts under seal, and negotiable instruments alleging a consideration upon their face, in the hands of innocent holders without notice, who have received the same before dishonored." It is said in *Sivell* v. *Hogan,* supra, that this section of the code is declaratory of the common law; and this is true in the sense that it is not the codification of a statute. However, in so far as the section contains an assumption or indirect statement that at common law contracts under seal were conclusively *presumed* to be founded on a consideration, it is not an accurate declaration of the common-law principle on that subject. The courts and text-writers who have made the deepest and most philosophical research into the history of the question are in accord upon the proposition that specialties, those formal common-law contracts under seal, were enforced in the absence of an allegation of consideration, not because it was conclusively presumed that they were founded on a consideration, but because consideration was not an essential element to such contracts. Contracts under seal were enforceable at common law because of the formality of their execution, and such contracts were fully recognized and enforced long before the doctrine of consideration appeared in the law. In those early days the courts looked to the form and solemnity attending the execution of the promise, rather than to its nature, the subject-matter, or other surrounding circumstances, in determining whether the promise was enforceable and binding or not. Except in a few cases to which the common-law action of debt was applied, no contract was enforceable at early common law unless it was under seal. An ordinary executory contract not under seal was without a remedy for its enforcement. Later on, by looking at the breach of an executory contract not under seal as a wrong arising ex delicto, the courts afforded a remedy by extending to such transactions the action of trespass on the case, a remedy not originally designed for that purpose. For example, a plaintiff would allege that the defendant had done him a wrong and had damaged him in that he had undertaken to build a house in a good and workmanlike manner, which undertaking the defendant had not kept, whereby the plaintiff was damaged. To afford a remedy in such a case, the court looked upon the defendant's conduct as some-

thing in the nature of a deceit resulting in damage to the plaintiff, and applied to the transaction the tort action of trespass on the case. Finally this form of action was extended so as to afford a remedy for the breach of every promise which had resulted in detriment to the promisee. Cases arose, however, in which this remedy was invoked, and it appeared that the plaintiff had given the defendant nothing to induce his promise; that is to say, the plaintiff had suffered no detriment through the promise, since he had done nothing or given up nothing therefor; and the court refused to afford such a plaintiff the remedy. This was the inchoation of the doctrine of the necessity for consideration in contracts. The plaintiff was required to show that he had given a consideration, before he was allowed to have a remedy for the breach of the defendant's promise. A similar concept attached to the action of assumpsit when it came into use. On the general subject, see Anson's Law of Contracts; 2 Pollock & Maitland's History of English Law, c. 5; 3 Halsbury's Laws of England, 83, §170; J. B. Ames on the History of Assumpsit, 2 Harv. Law Rev. 1, 53.

In this connection, it may be pertinent to call attention to the peculiar relation existing between right and remedy at common law. In those times when the common law was being developed, the courts had a very indistinct concept of an actual wrong in the abstract; indeed for the most part it seems that they had no concept at all of a legal wrong apart from the forms of action which had been framed and developed from time to time. We recall the familiar Grecian tradition that the robber, Procrustes, had a bed used in the torture of his victims. He placed his captives on this bed, and if they were short they were stretched, and if they were tall they were lopped off so that the length of the body was made exactly the length of the bed. Common-law writs and forms were procrustean beds, and the rights of parties were the hapless victims that were stretched or cut to adapt them to the measure of the particular forms of action or defense which the courts had invented or permitted. Our doctrine, announced as a fundamental, in sections 3076 and 4929 of the Civil Code, that for every right there is a remedy, and every court having jurisdiction of the one may if necessary frame the other, is not declaratory of the common law as actually practiced. Lawyers in this State will recall an interesting paper on this subject read before the

Georgia Bar Association at its session in 1901 by Hon. Sylvanus Morris, dean of the law department of the University of Georgia.

Until the adoption of the Hilary rules, there was no provision, under the administration of the common law in the English courts, for pleading either an original lack of consideration or a failure of consideration, otherwise than under the general issue; that is to say, the plea of general issue put in issue not only the alleged promise, but also the alleged consideration therefor. 4 Enc. Pl. & Pr. 944. If, therefore, the suit were on a specialty, either by action of debt or covenant, since the prescribed form for either of these actions contained no reference to consideration, there was no possibility of raising the question of the lack of consideration by the plea of the general issue, as in assumpsit and other similar cases where a recital of consideration was required. The English courts, in the early times in which the principles of the common law were taking on their primitive embodiment, seem never to have been called upon to frame or permit a plea raising the point that a specialty was without consideration. A reason which promptly suggests itself as to why this state of things should have existed is that in those early times when commercial transactions were few, the execution of a deed or bond, or other paper at common law known as a specialty, was generally attended by such circumstances of solemnity and formality, and with such mature deliberation as to the consequences, that but few, if any, cases actually arose in which the person sealing the bond or other specialty did so without receiving from the obligee something which the law in later times called a consideration; and consequently the cases were naturally rare in which a defendant could have been likely to seek to raise, by plea, the defense of want of consideration. The courts, therefore, may not have been called upon to frame a plea for the setting up of want of consideration to an action based on a specialty; the remedy not being created, because there was no need for it. The foregoing statement relates, of course, to the earlier days of the common law; but those earlier days were nevertheless the formative period. While the courts were developing the doctrine of consideration as a necessary element of a simple contract, specialties continued to be enforced, because of the formality of their execution, and were considered as entirely without the rule thus more lately applied as to consensual obligations

not under seal.  McKelway, in his Common Law Pleading, 21, in discussing the earlier forms of actions, says: "The real fact of the matter was that there were two distinct grounds for holding a promisor liable on his promise, either one of which was sufficient,—one, and the earlier, because he deliberately intended to make himself liable and so indicated by the solemnity of the seal; the other, because he had received a consideration which it would be unjust to the promisee to allow him to keep unless he was held liable upon the promise."

So rigid was the common-law practice of enforcing contracts under seal, on account of the formality and solemnity of their execution, that the rule in courts of law was that a sealed instrument could be discharged only by another instrument of as high a character, or else by the surrender of it so that the creditor could not make profert of it.  A debtor who had complied with his bond but who had failed to take a release under seal could not defend an action on the bond.  On the other hand, the law courts enforced, with like hardship, the rule that the obligee in a sealed instrument which had been lost or accidentally destroyed was prohibited from maintaining an action upon it, since he could not make the profert which the inflexible rules of legal procedure required.  Pom. Eq. Jur. (3d ed.) §§ 70, 71, 383.  Thus the matter stood in the courts of law.  The courts of equity, however, took a broader view, more in accordance with common sense and the natural justice of the transaction.  "The important part played by the seal in the early common law, and the intensely technical and arbitrary effects produced by it according to the legal rules, are too well known to require any statement. . . Equity, disregarding such form and looking at the reality, always requires an actual consideration, and permits the want of it to be shown, notwithstanding the seal, and applies this doctrine to covenants, settlements, and executory agreements of every description." Pom. Eq. Jur. (3d ed.) § 383; Pollock's Principles of Contract, 168, 169; Ord v. Johnston, 1 Jur. (N. S.) 1063, 1065; Houghton v. Lees, 1 Jur. (N. S.) 862, 863; Jeffreys v. Jeffreys, Craig & P. 138, 141.  In a few of the early chancery cases, as is remarked in the footnote to the foregoing section from Pomeroy's Equity Jurisprudence, it was held that voluntary agreements under seal would be enforced; but these decisions and dicta have long since

been overruled. It is a well-settled equitable doctrine, resting on innate justice, that in every binding contract there must be a quid pro quo.

Every student of the development of the common-law system has been struck by the fact that between the courts of law and the courts of equity there existed throughout the formative period a juridic jealousy. Whenever courts of equity began to give a remedy which modified the rigor and technicality of any common-law principle especially prolific of hardship and injustice, the law courts would at first protest against the invasion, but would finally follow the lead by themselves finding some way to give the same relief against the hardship and injustice. This was frequently done by resort to fictions; at other times by providing new writs, new processes, or new pleas formerly unknown or unrecognized. Usually, in the end, the law courts reached the point that in ordinary transactions they dealt the same degree of substantial justice (as contradistinguished from formal justice) as did the courts of equity. For example, despite the rigid adherence of the early common-law courts to the rule that, although the debtor on a bond or other specialty had paid the demand in full, but had failed to secure a release under seal or a surrender of the instrument, even if he had taken an ordinary receipt reciting the payment of the bond, the creditor might still sue and recover the full amount of the bond again, yet when the courts of equity broke in on the rigor of the law and gave a remedy against this hardship, the common-law lawyers at first inveighed against the courts of chancery for this invasion of legal rules; nevertheless the equitable doctrine long ago became a part of the law enforceable in any and all courts. See Pomeroy, supra, §383, note 2. As showing how reluctance in this respect finally became alacrity, if not eagerness, it is interesting to note the case of Sturdy v. Arnaud (1790), 3 T. R. 599, in which the defendant had given to his creditor a bond to secure an annuity, but before this demand became due loaned him a sum of money, and it was agreed that the latter should retain the payments of the annuity as they became due, until the same was discharged; and this creditor having become bankrupt and the defendant being sued by his assignees in bankruptcy, the agreement to retain was held to be well pleaded to an action on the bond for the payments on the annuity accruing after

bankruptcy; the pleading of such agreement and the retainer being held to be equivalent to a plea of solvit ad diem. Counsel argued that the defendant had no right to retain the arrears of this annuity against the debt due by him to the bankrupt, on the ground that the agreement would operate as a defeasance, and there could be no defeasance of a deed or specialty by a mere recital not under seal; and he cited the case of Plennerhasset *v.* Pierson, 3 Lev. 234. Lord Kenyon, C. J., replying to this argument of counsel, said: "Indeed I should be sorry for the plaintiffs themselves if the law were with them, since their conduct is so unconscientious that if the defendants were to apply to a court of equity for relief, that court would not only give such relief, but would also decree the plaintiffs to pay the costs both in law and equity; on the same principle on which Sir Thomas More, when Lord Chancellor, proceeded when he first gave relief against the penalty of the bond, the obligee in that case having paid the sum mentioned in the condition after, though not on the day."

So far as we have been able to find, no court of law situated in a jurisdiction administering the unmodified common law has so far departed from the early doctrine as to allow a plea of want of consideration as a defense to a purely legal action on a common-law specialty; and yet to this extent alone the ancient rule seems to have preserved its original rigor. See footnote to the case of Garden *v.* Derrickson, 2 Del. Ch. 386, as reported in 95 Am. Dec. 286. See also Joyce on Defenses to Commercial Paper, §217.

In this State, while the common law affords the basis of our system of jurisprudence, we have adopted the common law only so far as it is suited to our form of government and to our general juridic policy. We have emancipated substantive law from the forms of action, so that the former is no longer dependent upon the latter for its right of recognition. The form and the remedy are now subservient to the right. The distinction between law and equity has been to a large extent abolished, and courts of law administer equitable rights, and equitable defenses may be filed to actions at law. We no longer, except in a few very rare cases, resort to those fictions by which the common-law courts were wont to give elasticity to the system, but we do directly and without apology what the common-law courts did indirectly and, in a sense, equivocally.

The common-law rule that a seal attached to an instrument would, by its very presence, dispense with the necessity for consideration—that element which the experience and mature thought of mankind has come fully to recognize as essential to every contract which is to be given legal efficacy—is antiquated and obsolete. In early times the seal was a solemn thing. It was a symbol of the knight's honor pledged to his promise. It was the coat of arms taken from the device engraved on the shield of knight or nobleman and planted upon the bond as a gage of faith. The bond thus sealed was in some sense an imitation of that early form of promise which was secured "by oath and wed and borh." There was a time when the adding of the seal had a distinct religious aspect and was used to create a binding obligation on the conscience of the promisor, rather than to give a specific civil liability against him. In those days only the few had seals. At the date of the Conquest the Norman Duke had a seal and the late King of England had had a seal, but only these and bishops and counts had them. In France during the times of Bracton the privilege of using the seal was confined to the "gentixhomes." In England in the 13th century, when the law for the great had become the law for all, every free and lawful man was permitted to have a seal. 2 Pollock & Maitland, History of English Law, 221. It is a far cry from the day when the nobleman placed the device from his coat of arms as a seal upon his bond, or his humbler neighbor bit the wax with his foretooth for a like purpose, to the "L. S." of everyday use, employed without any circumstance of solemnity, and printed, not by the party himself nor by his lord, but by some printer upon a standard commercial form. Compare *Lowe* v. *Morris,* 13 *Ga.* 153, and *Sterling* v. *Park,* 129 *Ga.* 311 (58 S. E. 828, 13 L. R. A. (N. S.) 298, 121 Am. St. 224). Judge Russell, who has written the opinion of the court this day filed in the case of *Sims* v. *Scheussler,* ante, 850 (64 S. E. 99), involving a like question, has quoted at length from the lurid language of the judge in the *Lowe* case, supra, and it is not necessary that I should do so here.

So much of the common law as declared that the form alone in which the contract was embodied and the formality with which it was executed were equivalent to a consideration, or so important as to forbid inquiry into consideration, or to dispense with the

necessity for it, is utterly unsuited to our times and to our commercial activities, and is out of harmony with our system of jurisprudence. It it wholly obsolete. In those days form was everything and substance nothing: in our times we disregard form and look to the substance of transactions. Mutual intention and lawful consideration, and not mere useless form, are with us the cardinals that give to contracts essence and that particular quality which commands and permits courts of law to enforce them. Wherever form has a substantial value it is preserved and regarded; otherwise it is not. The formality of writing required by the statute of frauds serves a useful purpose, and neither law nor equity would raise a hand to destroy it. A will is an instrument which stands or falls according to its formality, and depends not on consideration; and since there is a useful purpose in preserving this formality, law and equity alike observe it. There may be cases, indeed we think there are, in which a sealed instrument or specialty will be enforced though it has no consideration. For instance, it is a principle well recognized that a person desiring to make a gift of money in future can not accomplish this end effectively by the execution of a simple contract or promissory note and the delivery of it to the proposed beneficiary. Therefore, the adoption of a sealed instrument as a means of making a gift of money in the future has sometimes been resorted to and recognized even in those jurisdictions which in other instances deny the validity and sacredness of the seal. See the note to the case of Richardson *v.* Richardson, 26 L. R. A. 308. Thus, in New Jersey, by statute, a seal is not conclusive evidence of consideration. In the case of Aller *v.* Aller, 40 N. J. L. 446, it was held that a promise under seal to pay money, though voluntary, was still enforceable, even after the death of the obligor, if the intention to make a gift was proved. Our minds give full assent to the correctness of this proposition. So, too, we can conceive of a case, and such cases have arisen, where an office is created without emoluments, and yet a bond for the faithful discharge of the duties of the office has been required. The giving of such a bond may be said in a very fair sense to be without consideration on the part of the obligor, and yet, without any violation of the rule we are seeking to support, a recovery on such a bond may be upheld. Indeed there is much to support the theory intimated as obiter

by Judge Starnes in the case of *Albertson* v. *Halloway,* 16 *Ga.* 379, that the common-law rule still applies to those specialties which were known as such at common law, e. g., deeds, single and double bonds, etc.

Commercial negotiable instruments under seal were not recognized at common law. To apply to them the rigor of the common-law rule dispensing with consideration is to apply this rule in a case in which the common law itself did not apply it. A negotiable promissory note under seal is a legal hybrid; but it is fully recognized in the law of this State. Such a note at common law would not have been a commercial paper, nor would it have been classed as a negotiable instrument. We treat it as a commercial paper, and apply to it all the incidents of a negotiable instrument. The custom of putting a seal upon a promissory note has come about, not through a desire on the part of those making and taking such papers to foreclose the question of consideration, but chiefly to make the period of the statute of limitations applicable thereto twenty years instead of six years. It would seem just and reasonable and highly expedient, therefore, that the presence of the seal on such instruments should have no higher effect than the parties using it intend that it should have, and should not give to it the effect of foreclosing the question of consideration. As showing how any other rule would result in hardship, take the case of A, desiring to borrow money from B, with C willing to give his accommodation paper to A, that he might transfer it to B as security for the loan. B prefers that the note he takes as collateral security shall be sealed, in order that it may not go out of date before the expiry of a period, more than six years, during which the loan is to run. C, therefore, executes his note under seal to A, who indorses it as collateral security to B. Afterwards A pays the debt due to B, and receives back the note signed by C. Shall he then be entitled to collect this accommodation paper out of C?

Our use, in this State, of promissory notes under seal is so frequent as to make it a matter of the greatest inexpediency and bad policy to allow an inapt and antiquated rule of the common law to stand in the way of inquiry into the consideration for such paper. Whether we look at the question from the view that a sealed contract will be enforced because of its formality, without

reference to the question of consideration, or from the view that when a seal is present the law, as a rule of evidence, conclusively presumes that there was a consideration, and will hear no proof to the contrary, we should be led into such absurdity that even the stoutest defender of the common-law doctrine would hesitate before carrying it to its limits, if we should attempt to apply it to a case where a debtor had executed under seal a number of volunary promises to pay and the holders of these promises attempted to enforce them against the debtor's property or estate, in prejudice to the rights of creditors, where the debtor had become bankrupt or had died, or for any other reason his property should be before the court for administration. There is hardly a lawyer or a laymen whose innate sense of justice would not be shocked at such a thing, and yet the common law had no exceptions to the rule in favor of third persons; though courts of equity did. The whole temper of our times, the general scheme of our jurisprudence, is in accord with the policy that a person should not irrevocably bind his property or his estate by voluntary contracts or agreements, by promises for which he gets nothing and which cost the promisee nothing.

We have shown above that courts of equity have always refused to give the same sanctity to a seal as did the courts of law, and have always allowed inquiry into consideration, and have never dispensed with the necessity therefor. We have adverted to the fact that in this State equitable defenses may be asserted in courts of law. Civil Code, § 5049, provides: "The defendant may, by proper pleadings, raise issues of law, or of fact, legal or equitable or both." Any equitable defense not necessitating the granting of affirmative extraordinary relief may be successfully filed in a city court. *House v. Oliver*, 123 *Ga.* 784 (51 S. E. 722); *Gentle* v. *Atlas Savings & Loan Asso.*, 105 *Ga.* 406 (31 S. E. 544); *National Bank* v. *Carlton*, 96 *Ga.* 469 (23 S. E. 388). It follows, therefore, that when a defendant is sued upon a sealed instrument lacking in consideration, he may plead the defense of want of consideration, in a court of law, as he formerly could have done in a court of equity. This express point was ruled in the case of *Judy v. Louderman*, 48 Ohio St. 562 (29 N. E. 181). In 1834 an act was passed in that State permitting the plea of lack of consideration to be filed in an action founded on a specialty, but

this act was subsequently repealed. The code of civil procedure, afterwards adopted, provided, however, that "the defendant may set forth in his answer as many grounds of defense, counter-claim and set-off as he may have, whether they be such as have been heretofore denominated legal or equitable, or both." The court, in holding that if a sealed obligation was executed without consideration a defendant might under this section plead it as a defense in a court of law, said: "As against a strictly legal cause of action, a defendant, therefore, may now set up an equitable defense, and thereby not only bar the plaintiff's action, but obtain the proper affirmative equitable relief connected with the subject-matter. And although the common law, in requiring a valuable consideration in order to render an agreement valid and binding, declared, in its strictness, that a seal was conclusive evidence of such a consideration, yet, in determining rights of parties upon equitable principles, a seal has been divested of the apparent sacredness with which it was clothed by the common law; and equity, looking rather to reality than form, does not permit a seal to supply the place of a consideration, and, notwithstanding the seal, will allow the want or failure of such consideration to be shown in the enforcement of executory contracts of every description. In Richardson v. Bates, 8 Ohio St. 264, it was said by Sutliff, J.: 'Under the statute of February 24, 1834, allowing the failure or part failure of consideration to be given in evidence, in a suit upon a specialty, the facts stated in the answer would have constituted a perfect defense. And the provision of the code allowing a defendant to set forth in his answer equitable, as well as legal grounds of defense, permitted the same defenses to be made in this case; and therefore the failure of consideration, stated in the answer, constituted a good defense.'" Now summing up: The law courts of England, prior to the adoption of the common law in this State, enforced, without reference to or thought of consideration, certain contracts executed according to an ancient and solemn form and known as specialties; deeming the mere formality of execution to be a sufficient reason for their enforcement. This State adopted the law of England (and hence the body of the common law) in force on May 14, 1776, only so far as it was suited to our conditions, form of government, and general policy. Even at common law, as it became more developed, the right and

justice of requiring consideration as an element of contracts was recognized, and only a slavery to procrustean form and ancient precedent upheld the doctrine that specialties might be enforced in the absence of consideration. Equity refused to bow the knee to form, was willing to observe it only when it subserved some useful purpose, and disregarded it when it stood in the way of the erection of just and substantial principles; hence the equitable doctrine was that, except in certain rare cases, a contract would not be enforced because of the formality of its execution alone. At the date of our adoption of the common law the tendency was strong in the courts of law to break away from slavery to form and technicality, and to approach nearer to the standards of equity jurisprudence, even in the administration of what they called legal rights. In this State the distinctions between legal and equitable rights have been largely abolished; for every right there is a remedy; and even in a court of law, equitable defenses not involving relief through some extraordinary remedy may be pleaded to a strictly legal action. A sealed negotiable promissory note is a form of contract unknown to the common law; hence it is doubtful that such a contract would, even in a court adhering strictly to the common law, be regarded as so formal a contract as to deserve enforcement without reference to consideration and for its formality alone. Certainly such a contract, though under seal, would not be enforced in a court of equity, if wanting in consideration. Hence, under our system, which allows equitable defenses in legal actions, a plea of total lack of consideration may be successfully pleaded to an action on such a contract, even in a court of law. The ruling of the trial court was, therefore, erroneous.                    *Judgment reversed.*

---

RULE 5. *Argument.* Argument is limited, in misdemeanors and in cases originating in municipal courts, justice's courts, or county courts, to thirty minutes on each side, and in all other cases to two hours on each side, unless by special leave an extension of time is granted by the court; and none will be granted except on specific application made before the argument of the case is begun. Save when section 5581 of the Code applies, only two counsel on each side will be heard. The plaintiff in error opens and concludes; and on motions the movant has the like privilege. The reading from authorities cited on the brief, while not absolutely prohibited, is usually unnecessary and is therefore discouraged.

(*As amended March 1, 1909. 1 Ga. App. p. XI.*)