23339. CONSTITUTION PUBLISHING COMPANY *v.* LEATHERS.

DECIDED FEBRUARY 6, 1934.

*Howell, Heyman & Bolding,* for plaintiff in error.
*A. Walton Nall,* contra.

MACINTYRE, J. J. E. Leathers instituted an action against the Constitution Publishing Company to recover damages for an al-

leged libel. The petition alleged that the defendant falsely and maliciously did publish of and concerning the petitioner in the Atlanta Constitution the following false and malicious language, to wit: "The Constitution, Atlanta, Georgia. Saturday, March 7, 1931. Five Members of two families are jailed in war on Bandits: Friday was anything but a red-letter day in the lives of the Chestnut Street Leathers and the Griffin Street Spratlins, who, according to the police, have contributed no less than five pictures to Atlanta's rogues' gallery, all five subjects being convicted or alleged bandits. The fourth and fifth members of the two families were jailed in Miami early Friday morning while the Atlanta police, who late Tuesday had locked up the second and third members and were checking the records of the State prison commission to make certain that the first member to become embroiled with the law still is in the chain gang. The first member, Jack Spratlin, still is on the gang, where he is serving a long term for the robbery of the Foote-Davies plant several years ago. Ernest Leathers and E. W. Spratlin, 22, younger brother of Jack's were caught in the Atlanta police net Thursday when six alleged burglars were rounded up. Chief of Detectives, A. Lamar Poole, after the arrest of Leathers and Spratlin, ordered the arrest of Leathers' cousin, Clyde Leathers, and Jack and E. W. Spratlin's still younger brother, R. M. Spratlin, whom he sought to question in the Atlanta robberies. While his men were out searching for the pair advices came from Miami which said the pair had been locked up there within a few minutes after three bold holdups in the business sections, and further that the victims in the three robberies had identified them as the bandits. Chief Poole said Friday night that he had telegraphed Miami police asking that the pair be turned over to Atlanta police but that the Florida authorities had refused, saying they were positive of convicting them there. The chief, however, said four Atlanta officers, two county policemen, and two city detectives, were to leave Atlanta this morning for Miami to make a personal effort to obtain custody of the two men. 'If we can get those two to add to the six we have, we can clear up a number of robberies here,' Chief Poole said. 'The six men we have arrested have given us details of at least 20 cases, all save one admitting participation in them, and it may be that we will be able to clean up more than 75 holdups and burglaries and motor-car thefts to

the gang. I wish we could have them all here, but if the Miami police are able to convict the two they have, I'll be satisfied.' Chief Poole's office was busy Friday taking care of a number of hold-up victims who called to identify the alleged bandits and to recover property taken from them in the robberies. Much of the loot was recovered by the police when they rounded up the six men here .Thursday." The petition is not aided by innuendoes as to the person referred to, nor do the allegations in the petition show by extraneous facts that the plaintiff was the person referred to, other than it alleges that the defendant unlawfully, falsely, and maliciously charged the petitioner and the members of his family with crimes against the laws of the State of Georgia and termed the petitioner and members of his family convicted criminals or contributors to the rogues' gallery of Atlanta, and also alleges that "Petitioner shows that he did not nor did any of his family have any part in any crime punishable under the laws of the State of Georgia, any other State, or the United States, nor has your petitioner or his family ever been alleged bandits until the publication of said article in defendant newspaper." The plaintiff·further alleges by way of amendment: "That said publication was falsely, unlawfully, and maliciously published as aforesaid of and concerning what defendant termed the 'Chestnut Street Leathers,' and, as your petitioner is named Leathers and was residing and has resided on the said Chestnut Street for a long period of time, said publication injured and damaged your petitioner, charged him and members of his family with a crime, and subjected your petitioner to public hatred, contempt, and ridicule."

We are aware that the general rule is that the question whether a particular publication is libelous, as well as whether the libelous matter was of and concerning the plaintiff, is a question of fact for determination by the jury. *Horton* v. *Georgian Company,* 175 *Ga.* 261 (165 S. E. 443). Odgers, in his work on Libel and Slander, 147, says: "The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. 'An innuendo cannot make the person certain which was uncertain before.'" (4 Rep. 17b.) The same author gives the following illustrations: "If a man says 'My brother' or 'My

enemy' is perjured, and hath only one brother or one enemy, such brother or enemy can sue; but if he says, 'One of my brothers is perjured,' and he hath several brothers, no one of them can sue (without special circumstances to show to which one he referred)." "So if a man says to the plaintiff's servant, 'Thy master Brown hath robbed me,' Brown can sue; for it shall not be intended that the person addressed had more than one master of the name of Brown. So if the defendant had said, 'Thy master," *simpliciter;* or to a son, 'Thy father;' to a wife, 'Thy husband.'" "But if the defendant said to a master, 'One of thy servants hath robbed me,' in the absence of special circumstances no one could sue; for it is not apparent who is the person slandered." In the case of Maybee *v.* Fisk, 42 Barb. (N. Y.) 326 the court said: "Where the complaint, in an action for slander, alleged that the plaintiff was the eldest of three sons of M.; that the defendant in a conversation with M., and in the presence of others, used the following false and slanderous words concerning the plaintiff, viz., 'Your boys stole my corn,' meaning thereby the plaintiff; it was *held* that the action was maintainable; that the words were actionable *per se;* and the plaintiff, as one of the persons included in the charge, could bring his separate action for the slander. *Held,* also, that a charge to the jury that the plaintiff was entitled to recover, unless the jury should find that the defendant, immediately after making the charge, added by way of explanation, 'I mean your two youngest boys,' to the knowledge of the persons who heard the words complained of, was not erroneous." If the petition in the case just above cited had alleged that the plaintiff was the oldest of three sons of M.; that the defendant had written a letter complaining about the loss of his corn and published it and said therein, "Your boys stole my corn," and immediately therein added by way of explaination, "I mean your two youngest boys," and there were no other extraneous facts alleged showing that he referred to the oldest son, would the petition have been good as against a general demurrer? We think not, for he added an explanation which conveyed to the readers of the letter the fact that he did not make a criminal imputation upon the oldest son. "Of course, to be actionable the defamatory article must refer to some ascertained or ascertainable person, and no innuendo can make the words defamatory unless they reflect upon such individual as such or a class

in certain instances." Fenstermaker *v.* Tribune Publishing Company, 12 Utah, 439, 460 (43 Pac. 112, 35 L. R. A. 611). With reference to the publication of an article affecting a class of persons, the following general rule is laid down in 23 L. R. A. 732: "(1) If defamatory words are used broadly in respect to a general class of persons, and there is nothing that points, or by colloquium or innuendo can be made to apply, to a particular member thereof, such member has no right of action. (2) But if the language is employed toward a comparatively small group of persons, or a restricted or local portion of a general class, and is so framed as to make defamatory imputations against all members of the small or restricted group, any member thereof may sue. (3) On the other hand, if the words used in respect to the small or restricted group expressly but impersonally and indefinitely refer to one or more of the several members thereof, one of the members, in order to maintain his action, must establish the application of the language to himself." The article in this case refers in the headline to five members of two families, and then in the body of the article it says: "Friday was anything but a red-letter day in the lives of the Chestnut Street Leathers and the Griffin Street Spratlins, who, according to the police, have contributed no less than five pictures to the Atlanta rogues' gallery, or five subjects being convicted or alleged bandits." The article then goes on and states the names of the five members of the two families who it says were guilty of being bandits. The petition with the article attached as a part thereof, having alleged that the article was published of and concerning what it termed the "Chestnut Street Leathers," further says, "as your petitioner is named Leathers and was residing and has resided in said Chestnut Street for a long period of time," if there had been no explanation in the article as to who was referred to the plaintiff would be allowed to show that such libel was against his family, that is, against each and every member thereof, because the libel applies to each individual member of the family (a restricted class) by the use, without discrimination, of the collective appellation, and if the family as a whole was libelled the defendant as a part thereof was libelled. However, where the article names and points out therein which members of the family are referred to and the plaintiff is not called by name therein, the above would not be true. If the charge had been that five members of the

"Chestnut Street Leathers" and "Griffin Street Spratlins" were criminals, without naming which five were meant, it would be incumbent upon the plaintiff to show that the defendant meant that he was one of the five, or that under the allegations of the petition the article was reasonably susceptible of such a construction by a reader thereof. However, where the article states that five members of the two families were guilty of crimes and in the same article names the five persons to whom reference was made (the plaintiff not being one of the five), it is such a designation of the persons referred to as to exclude from the mind of the reader any imputation that the defendant intended any other person than the ones personally and specifically named. Under the allegation of the petition, we think that the explanation in this article conveyed to the minds of its readers the fact that it did not make an imputation upon the plaintiff. In other words, this is the only construction, by the reader, of which the article was reasonably susceptible. It follows that the trial judge erred in overruling the general demurrer.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*