39566. AMERICAN BROADCASTING-PARAMOUNT THEATRES, INC., et al. v. SIMPSON et al.

DECIDED JULY 3, 1962.

*Wilson, Branch & Barwick, M. Cook Barwick, Alexander E. Wilson, III, Tom Bentley,* for plaintiffs in error.

*Smith, Kilpatrick, Cody, Rogers & McClatchey, Thomas E. Joiner,* contra.

EBERHARDT, Judge. Before dealing with the specific aspects of this case it would be well to comment on some peripheral issues. First, there is no question raised that there was a "publication" here of the allegedly defamatory material or that the material is actually defamatory. See *Code* § 105-701. Secondly, defendant Crosley Broadcasting raises no issue with respect to *Code* § 105-712, as amended (Ga. L. 1949, p. 1137) which provides: "The owner, licensee or operator of a visual or sound radio broadcasting station or network of stations, and the agents or employees of any such owner, licensee or operator, shall not be liable for any damages for any defamatory statement published or uttered in or as part of a visual or sound radio broadcast, by one other than such owner, licensee, or op-

erator, or agent or employee thereof, unless it shall be alleged and proved by the complaining party, that such owner, licensee, operator or such agent or employee, has failed to exercise due care to prevent the publication or utterance of such statement in such broadcast." Although there are no decided cases in Georgia applying this provision, we think that the language "visual or sound radio broadcasting station" is sufficiently broad to encompass television stations and their broadcasts.[2] We find failure to exercise due care is sufficiently alleged (e.g., defendants "failed to exercise the slightest degree of care to prevent the publication. . .")[3]

■ Perhaps the most perplexing problem is whether defamatory material shown on television should be classified as a libel, a slander or in some third category. *Code* § 105-701 provides that a libel is "expressed in print, or writing, or pictures, or signs" while *Code* § 105-702 states that slander is "oral defamation."[4] It can be readily seen that there are some ele-

---

[2]Further support for this position is found in the fact that the legislation is an almost in toto enactment of the "model act" suggested by the National Association of Radio and Television Broadcasters. Leflar, Radio and TV Defamation, 15 Ohio State L. J. 252, 267-269, n. 62 (1954); Remmers, Recent Legislative Trends in Defamation by Radio, 64 Harv. L. R. 727, 741, n. 71 (1951). The last authority notes the possibility of Federal pre-emption of the field.

[3]Because the allegations apply to *both* defendants, we do not find it necessary to decide whether a failure to exercise due care must be alleged against the defendant television network under this section. See, Remmers, supra, note 1, at 752, n. 121. Several States have placed the burden of showing due care on the broadcaster. 9 Okla. L. Rev. 103, 106 (1956).

The legislation apparently makes at least the broadcaster's liability comparable with that of a "secondary publisher" of printed libel.

[4]"A libel differs from a slander, in that a publication may be libelous when, if spoken orally, it would not be slanderous. [Citations]. This distinction is said by the books to be based

ments of both libel and slander in this sort of television defamation. Courts in some other jurisdictions, however, seem content to attempt the squeezing of the defamatory remarks into the well worn libel or slander pigeonholes. See Leflar, 15 Ohio State L. J., supra, at 261.

Motion pictures involve an analogous situation. The only Georgia case involves a movie which did not name the plaintiff but which was widely advertised as being based on the book "I Am a Fugitive From a Georgia Chain Gang." *Warner Bros. Pictures, Inc. v. Stanley,* 56 Ga. App. 85 (192 SE 300). The book specifically named plaintiff. There the court treated the action as being one of libel, as did a subsequent appeal of the same case. *Stanley v. Warner Bros. Pictures, Inc.,* 64 Ga. App. 228 (12 SE2d 441).

The cases in other jurisdictions are uniformly in accord with this view but usually after a more extensive discussion of the issue. Kelly v. Lowe's Inc., 76 FSupp. 473 (D. Mass.) (pic-

---

upon the grounds that a vocal utterance does not import the same quality of deliberation, and is more prone to the ebullition of fleeting passion, mere effervescence or lack of mental equipoise, and to be accepted as indicative of feeling, rather than of conviction, and, therefore, not so much gravity is allowed to it as to words deliberately written down and published; the latter justifying the inference that they are the expression of settled conviction and affect the public mind correspondingly. So, too, an oral charge merely falls upon the ear, and the agency of the wrong-doer in inflicting injury comes to an end when his utterance has died on the ear, but not so with the written or printed charge, which may pass from hand to hand indefinitely, and may renew its youth, so to speak, as a defamation as long as the libel itself remains in existence, and hatch a new crop of slanders, to be blown hither and yon like thistledown at every sight of the libel, so that a printed slander, when published, takes a wider and more mischievous range than mere oral defamation, and is more reprehensible in the eyes of the law." Ukman v. Daily Record Co., 189 Mo. 378, 391 (88 SW 60).

ture, "They Were Expendable" based on book which named plaintiff in foreword and appendix; partial consent license rejected) ; Merle v. Sociological Research Film Corp., 166 App. Div. 376 (152 NYS 829) (silent movie) ; Brown v. Paramount Publix Corp., 240 App. Div. 520 (270 NYS 544), and the celebrated "Rasputin" case, Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd., 50 Times L. R. 581, 99 ALR 864 (Ct. App.). See 42 Va. L. R. 63, 73 (1956).

In television and radio cases, the courts have often based classification of the defamatory matter on whether or not a prepared script was used; a libel being found where script is used and "slander" where the extemporaneous remarks are made.[5]  Compare Landau v. Columbia Broadcasting System, Inc., 205 Misc. 357 (128 NYS 2d 254) (dramatic television presentation from script held libel) with Remington v. Bentley, 88 FSupp. 166 (SD, NY) (defamatory remark on extemporaneous television program held slander, applying New York law).  But see Shor v. Billingsley, 158 NYS 2d 476, holding to the contrary.  Occasionally the situation is analogized to the reading of a libelous letter, which is still libel although an oral publication takes place.  E.g., Hartmann v. Winchell, 296 NY 296 (73 NE2d 30, 171 ALR 759). See *Code* § 105-705. But whatever the rationale, we think the distinction bears very little relationship to the realities of the problem.  After all, the listener or viewer cares little and often does not know whether a script is being used. Nor does the use of a script have any relationship to the broadcast's ability to harm.

---

[5]There is no specific allegation here that a script was used although it is highly unlikely that any "dramatic" program such as "The Untouchables" could be presented without a script.  It is alleged that Desilu Productions, Inc. "produced" the show.  However, neither Desilu nor the sponsor nor the sponsor's advertising agency nor any actor in the dramatic cast is named as, a party defendant. See: Spring, Rights and Risks, § 24 (1956 Rev. Ed.) where the actors, the sponsor and the sponsor's advertising agency are said to be "primary publishers." See: Remmers, 64 Harv. L. Rev., supra, at 753; 22 Law and Contemporary Problems, 539.

Commercial television began during the latter part of the decade beginning in 1940 and commercial radio less than forty years ago. Thus both media present new factual situations with respect to defamation, and we have pointed out above some of the difficulties that the courts have had in reconciling this type of defamation with the traditional libel-slander dichotomy. In truth, these new media pose new problems which cannot realistically be solved by resort thereto.

In Georgia, the libel and slander Code sections are a codification of the common law. *Blackstock v. Fisher*, 95 Ga. App. 117, 120 (97 SE2d 322). When the common law first recognized a right of action for defamatory remarks the only action was for slander. Then the development of a new medium—the printing press—led to the development of an action for printed defamation called libel. Restatement, Torts, § 568, Hist. note b (1938); Spring, Rights & Risks, § 20 (1956 Rev. Ed.); 42 Va. L. Rev. 63 (1956). May not the common law of Georgia develop a new classification to deal with these new media?

Our Supreme Court said when it recognized the right of a child to sue for injuries sustained while still in the mother's womb, that, in the absence of binding precedent, the court "will reach a decision based upon sound principles and fair deductions from the common law." Per Duckworth, C. J., in *Tucker v. Howard L. Carmichael & Sons, Inc.*, 208 Ga. 201, 203 (65 SE2d 909), and see the cases there cited. In the leading case recognizing the right of privacy in America it was said: "The novelty of the complaint is no objection when an injury recognizable by the law is shown to have been inflicted on the plaintiff. In such a case 'although there be no precedent, the common law will judge according to the law of nature and the public good.'" Per Cobb, J., in *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 193 (50 SE 68, 69 LRA 101, 106 ASR 104, 2 AC 561). Accord: *Burks v. Green*, 85 Ga. App. 327, 330 (69 SE2d 686); *Brown v. Ga.-Tenn. Coaches, Inc.*, 88 Ga. App. 519, 532 (77 SE2d 24); *Brown v. Ledger-Enquirer Co.*, 97 Ga. App. 595, 596 (103 SE2d 616), rev. on other grounds, 214 Ga. 422 (105 SE2d 229). And, in another case, "Such decisions as this do not involve a disregard of statute, or sound rules of

conduct or any constitutional provision . . . Answering . . . [defendant's] argument, we do indeed have a 'charge to keep,' but that charge is not to perpetuate error or to allow our reasoning or conscience to decay or *to turn deaf ears to new light and new life.*" (Emphasis added). Felton, J., in *Brown v. Ga.-Tenn. Coaches, Inc.,* 88 Ga. App. 519, 532, supra. Further, "Some courts have held that the relief here sought can be granted only by legislation, and that in the absence of such legislation the courts are without power to grant it. Usurpation of the functions of the legislature by the courts is never justified, and will not be tolerated. But this fundamental principle is not upheld by a refusal of the judiciary to discharge to the limit of its authority the functions imposed upon it by the Constitution, upon the excuse that further legislation is necessary." Duckworth, J. (now C. J.), in *Hornsby v. Smith,* 191 Ga. 491, 500 (13 SE2d 20, 133 ALR 684). See *Lacey v. Hutchinson,* 5 Ga. App. 865 (64 SE 105), and *Sammons v. Webb,* 86 Ga. App. 382, 391 (12a) (71 SE2d 832). *Code* § 3-105 embodies that ancient principle that "For every right there shall be a remedy, and every court having jurisdiction of the one may, if necessary, frame the other."

As Holmes said, "[The law] is forever adopting new principles from life at one end, and it always retains old ones from history at the other, which have not yet been absorbed or sloughed off. It will become entirely consistent only when it ceases to grow." The Common Law, 36 (1881). And Cardozo: "Unique situations can never have their answers ready made as in the complete letter-writing guides or the manuals of the art of conversation." The Growth of the Law, 133 (1924). "Modification implies growth," said Brandeis, "It is the life of the law." State of Washington v. W. C. Dawson & Co., 264 U.S. 219, 236 (44 SC 302, 68 LE 646) (dissenting opinion). And see the excellent collection of authorities in Shor v. Billingsley, 158 NYS2d, 476, supra.

The genius of the common law has been its ability to meet the challenges posed by changing circumstances. Can there be any doubt that this situation poses one of those challenges? As was said by Judge Fuld in his concurring opinion in Hartmann v.

Winchell, 296 NY 296, supra: "If the base of liability for defamation is to be broadened in the case of radio broadcasting, justification should be sought not in the fiction that reading from a paper ipso facto constitutes a publication by writing, *but in a frank recognition that sound policy requires such a result.* . . That defamation by radio, in the absence of script or transcription, lacks the measure of durability possessed by written libel in nowise lessens its *capacity for harm.* Since the element of damage is, historically, the basis of the common-law action for defamation, and since it is as reasonable to presume damage from the nature of the medium employed when a slander is broadcast by radio as when published by writing, both logic and policy point the conclusion that defamation by radio should be actionable per se."[6]   (Emphasis added; citations omitted).

Furthermore, the defendants here were presenting a dramatization of a "stale" news event (as opposed to the reporting of "current" news at least partially in the public interest) and were presenting the dramatization for a profit. In such a situation there seems little doubt that entrepreneur or "non-fault" liability should be imposed as "The problem is purely one of allocating a probable or inevitable loss in such a manner as to entail the least hardship upon any individual and thus to preserve the social and economic resources of the community. . . Reputation may be harmed quite as much by a libel innocently or inadvertently published as by any other kind. Such a risk is properly allocated to those whose enterprises, operated for their own immediate profit, create it. Losses of this nature can be regarded as one of the expenses of the undertaking which caused it." Donnelly, Defamation by Radio: A Reconsideration, 34 Iowa L. Rev. 12, 23-24 (1948).

This is the underlying basis of the traditional non-fault newspaper liability. Spring, Rights and Risks, § 24 (1956 Rev. Ed.) ; 69 Harv. L. Rev. 875, 902-913; Holmes, The Common Law 138-139 (1881). See *Southeastern Newspapers, Inc. v. Walker,*

---

[6]See, on the "capacity for harm" theory, 42 Va. L. Rev. 63 (1956) ; Restatement, Torts, § 568 (1938).

76 Ga. App. 57 (2) (44 SE2d 697) and citations. The same considerations apply to radio and television defamation. Believing as we do that the common law must adapt, and classically has adapted, to meet new situations, we now make that "frank recognition" called for by Judge Fuld, supra, that defamation by radio and television falls into a new catagory, thus completing the triptych. In this category, defamation by broadcast or "defamacast"[7] is actionable per se.[8] "The law may well be as astute to reach and cure as is the libeler to hide and do harm." Diener v. Star-Chronicle Pub. Co., 230 Mo. 613 (132 SW 1143, 1148).

The legislature recognized this new category in 1949 with the enactment of *Code Ann.* § 105-712. It is significant that the statute, quoted above, refers to "defamatory statements" rather than "libel" or "slander." This recognition is also shown by part of the same legislative package (Ga. L. 1949, p. 1137; *Code Ann.* § 105-714) which purports to limit damage as follows: "In any action for damages for any defamatory statement published or uttered in or as a part of a visual or sound radio broadcast, the complaining party shall be allowed only such actual consequential, or punitive damages as have been alleged and proved."[9]

---

[7]While this may be "a glossological illegitimate, a neological love-child" (*Morse v. State*, 10 Ga. App. 61, 62, 72 SE 534), we can think of nothing better—others similar are being generally accepted, i.e., "newscast," "telecast," "telstar," etc.

[8]The libel and slander classification case law is not controlling in such a category. However, the great body of the case law will not become obsolete, in the area, because certainly principles such as what is defamatory, what is privileged and so forth will continue to apply. A more complete development of the rules dealing with "defamacast" will of necessity await later cases.

[9]The meaning of "actual" or "actual consequential" damages (e.g., does this mean "special damages" as must be proved in many slander cases? See *Code* § 105-702) is not now before us and we express no opinion on the matter. See Remmers, 64

■ Count 1 alleged that in fact the prisoners were transferred in two railroad cars, each of which had an iron screen across both ends behind which sat an armed guard. One unarmed guard was locked inside each car with the prisoners. The guards worked two six-hour shifts daily. Only two guards worked shifts inside the Capone car: plaintiff and one Head, who was allegedly the captain of the guard. In the drama, only one unarmed guard was shown locked inside the Capone car and it is alleged that this guard is not shown "as a person in authority such as the captain of the guard."

Defendant attempts to characterize the situation as an "alternative defamation" such as "Either A or B accepted the bribe." It is admitted that liability in such a situation has not been adjudicated in Georgia heretofore but it is insisted that the majority of other jurisdictions would deny recovery. Plaintiff, on the other hand, contends that this is a situation where one not named in the publication may show by extrinsic facts that the defamation applies to him. Such a showing is said to be a jury question.

On either theory we think that plaintiff should prevail.

■ The "extrinsic fact" approach is not new in Georgia. In the 1891 case of *Hardy v. Williamson*, 86 Ga. 551 (12 SE 874, 22 ASR 479), the publication was: " 'Either by erroneous classification, or classification obtained by the brick company and their subcontractors, by collusion with the subordinate engineers of the construction company, or some of them, the work of the Chattahoochee Brick Company has been over-estimated to the extent of at least one hundred thousand dollars, and probably one hundred and fifty thousand dollars.' " There it was said in the headnote that "Even where the words used may at first sight appear only to apply to the subordinate engineers as a class, and not to be specifically defamatory of any particular one of them, still if the plaintiff can satisfy the jury that they referred especially to him, he would be authorized to main-

Harv. L. Rev., supra, at 745. Note the absence of a comma between the words "actual" and "consequential." However, a comma appears between these words in the caption of the act.

tain the action." In the opinion, at page 555 the court said: "[Plaintiff] avers in the declaration that . . . [the words] were spoken of and concerning him, and he avers extraneous facts to show that they referred to him; he alleges that during the controversy with the brick company, the defendant ordered that section of the railroad which the plaintiff had surveyed and classified to be re-surveyed and re-classified, and that whilst this was being done the words complained of were written and published, and that this caused people who read the publication to believe it was intended for him."

A number of other cases have held that, as a general rule, the question of whether the defamatory publication was referable to plaintiff by the use of extrinsic facts was a jury question. *Colvard v. Black*, 110 Ga. 642, 646 (36 SE 80) and citations; *Walker v. Sheehan*, 80 Ga. App. 606 (4) (56 SE2d 628); *Davis v. Macon Telegraph Pub. Co.*, 93 Ga. App. 633, 634 (3), 636 (92 SE2d 619) and citations.

No prior Georgia case appears to have presented the exact question involved here as to whether a dramatic presentation of an incident that actually happened may be defamatory. Here there is no allegation that plaintiff's name was used (or that a similar name was used) or that the actor portraying the corrupted guard resembled plaintiff in any physical way. The presentation is not based on a book which names plaintiff, thus distinguishing this case from *Warner Bros. Pictures, Inc. v. Stanley*, 56 Ga. App. 85, supra.

And there is a dearth of authority in other jurisdictions. However, a substantially similar situation occurred when the motion picture "Rasputin—The Mad Monk" was produced. Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd., 50 Times L. Rev. 581, 99 ALR 864. The film dealt with the alleged circumstances of the rise and fall of the influence of Rasputin on the Czar and Czarina of Russia. Rasputin's influence ended when he was murdered. In the film, a "Prince Chegodieff" is shown as Rasputin's killer and a "Princess Natasha" is shown as the Prince's betrothed. Both are members of the royal court. The alleged defamation took place when "Princess Natasha" is impliedly shown being raped (or seduced) by Ras-

putin. In fact, the plaintiff, Princess Irina, was 'a member of the royal court and later became the wife of Prince Youssoupoff. Prince Yossoupoff wrote a book, which appeared before the film, in which he claimed to have assassinated Rasputin. Princess Irina brought suit in libel claiming defamation because of the rape (or seduction) scene.[10]

The English Court of Appeals upheld a sizable verdict for the Princess, stating that a sufficient identity was shown to support the jury verdict even though the defendant claimed that it did not know Princess Irina existed when the movie was produced.

Thus, the semi-fictional portrayal of a real life event is fraught with the possibility that the public, or at least that segment of the public that knows the plaintiff, will believe that the presentation refers to the plaintiff. See, Restatement, Torts, § 564 (d) and Illus. 4 (1938). This is peculiarly a question for the jury, and we cannot solve it here. We think that the plaintiff meets the "extrinsic fact" test on general demurrer when he alleges that he was identified because the corrupted guard was not shown in a position of authority.

■ But even considering that plaintiff is not sufficiently identified by extrinsic fact, we think that *both* of the unarmed guards who were stationed on the inside of the Capone car during the transfer would be entitled to maintain an action. The question here is slightly different, involving the defamation of a small group.[11]

---

[10]Defendant's novel argument that portraying a woman as being raped is not any adverse implication against her chastity was brusquely rejected by the court (". . . it takes real courage to argue [this point]" said Lord Justice Scrutton). This case and a number of others brought in different jurisdictions were later settled. Dean, Hatred, Ridicule or Contempt, 167 (1954).

[11]There is apparently a distinction between defamation of a *group or restricted class*, as shown in Neiman-Marcus v. Lait, 13 FRD 311, discussed infra, and defamation of a *class*. For example, recovery was permitted one Jewish plaintiff where all

It is certainly true as contended by defendants that there is a split of authority on this question. See Neiman-Marcus v. Lait, 13 FRD 311, at 315 (SD, NY). There an interesting three-in-one suit on this point was presented. The suit was based on the book "U.S.A. Confidential," which attributed certain immoralities to "some" of a department store's nine models, to "most" of the store's twenty-five men's store salesmen and to 382 saleswomen. All nine of the models, fifteen of the salesmen and thirty of the salesgirls were plaintiffs. The court upheld the right of action of the models and the salesmen, stating at page 315: "An imputation of gross immorality to *some* of a small group casts suspicion upon all, where no attempt is made to exclude the innocent." Reliance was placed on Illustration 2 in Restatement, Torts, § 564 which is: "A newspaper publishes the statement that some member of B's household has committed murder. In the absence of any circumstances indicating that some particular member of B's household was referred to, the newspaper has defamed each member of B's household."[12] However, the suit was dismissed as

---

Jews in Quebec *as a class* had been defamed and there were only 75 Jewish families in Quebec. Ortenberg v. Plamondon, 24 R.J.Q. 69, 385 (CBR Quebec). See, Developments in the Law: Defamation, 69 Harv. L. Rev. 875, 894-901 (1956); Wilner, Defamation of a Collectivity, 90 Pa. L. Rev. 414, 428 (1942). Cf. *Constitution Pub. Co. v. Leathers*, 48 Ga. App. 429, 433 (172 SE 923). See generally on group libel, 34 Col. L. Rev. 1322 (1934); Wittenberg, Group Defamation, 15 Ohio State L. J. 273 (1954).

[12]Also cited was a case where three store employees were lined up by the manager and told, "You are one of three who trifled with the money." Recoveries by all three in separate suits were affirmed but only because the appellate court was equally divided. Montgomery Ward & Co. v. Harland, 205 Miss. 380 (38 S2d 771); Montgomery Ward & Co. v. Blakely, 200 Miss. 81 (25 S2d 585); Montgomery Ward & Co. v. Skinner, 200 Miss. 44 (25 S2d 572).

The opinion upholding recovery relies on the 1850 case of

to the salesgirls because there the charge was general (essentially "all") and the group was so large. See, Restatement of Torts, § 564, Illus. 3.

*Hardy v. Williamson*, 86 Ga. 551, discussed supra, would apparently uphold this view. There the court said, at p. 557: "Nor does it make any difference that the words were put in the disjunctive, to wit, 'the sub-engineers, or some of them.' It may turn out on the trial that the expression 'or some of them' was used because the writer did not mean that all were guilty, but that the plaintiff, alone or with others, was guilty. *The plaintiff would be equally aggrieved if charged alone, or as one of a number of engineers, and equally entitled to maintain his action."* (Emphasis added). [13]

Not only does this case involve a new type of publication of defamatory matter (a "defamacast"), the paucity of cases in this area being fully discussed in Division 1, supra, but the form of the defamatory presentation (a dramatized account, depicting one person, of a factual occurrence where two persons participated) presents a situation for which we have found no precedent and cannot, we think, be placed in the relatively simple "A or B accepted the bribe" category. These reasons especially contribute to our holding that the plaintiff is entitled to have a jury assess his injury, if any. As Judge Kaufman said in upholding the actions by the models and men's salesmen in Nieman-Marcus, supra, at 315: "This result seems to find support in logic and justice. . ."

It was not error to overrule the defendants' general demurrer to count 1.

■ Turning to count 2, plaintiff is attempting to maintain his action as one of the group of sixteen guards involved in the

---

Forbes v. Johnson, 50 Ky. 48, and *Hardy v. Williamson,* 86 Ga. 551, supra.

[13]In view of the court's rationale as discussed in Division 2(a) of this opinion, it may be that this statement was dictum. Defendants admit that the rule enunciated in *Constitution Pub. Co. v. Leathers,* 48 Ga. App. 429, at 433, supra, was dictum and therefore not binding.

prison transfer. The size of the group has been said to be determinative in these cases. 69 Harv. L. Rev. 875, 894. While the group of fifteen men's store salesmen of a total of twenty-five employed at the time of publication in Nieman-Marcus, 13 FRD 311, supra, is apparently the largest group whose right of action has been upheld, we do not think that the size of this group of guards would prohibit recovery under the group defamation theory approved in Division 2(b) of this opinion. The difficulty here is that, despite plaintiff's ingenious attempts to plead around the problem, the defamation is simply not "of and concerning" plaintiff *as a member of the sixteen-man group*. As the factual statement shows, the only guard shown as corrputed is the guard inside the Capone car. The pleadings show that only two guards were ever utilized in this position—plaintiff and captain of the guard Head. While plaintiff may maintain his action on either basis outlined in Division 2 of this opinion ("extrinsic fact" or "group of two") he cannot, for this factual reason, maintain it as a member of the group of *sixteen*. On this basis only, the count is essentially a repetition of count 1 and the general demurrers were properly overruled.

■ Turning now to the special demurrers, we find that they deal with several areas of the petition:

■ Impression conveyed by telecast. These demurrers attack as conclusions allegations that the program conveyed the impression of factuality (Numbers 3, 10) or the impression that one of the guards on the train committed the crimes alluded to (Number 13) or that it was "readily apparent" from the first half of Part One that the defamation would continue through the remainder of Part One and Part Two (Numbers 7, 15). Plaintiff's difficulty here is the problem of conveying in his petition what was transmitted in the broadcast. Determinative is what was said in *Warner Bros. Pictures, Inc. v. Stanley*, 56 Ga. App. 85, supra, at 109, that: "What impression the picture made on those who saw and heard it, and what the picture showed, would necessarily have to be stated in general terms. These general terms can not be held, in a case like this, to be conclusions of the pleader, for the reason that the actions, looks, and subtleties of a moving picture can not be transferred to

the printed page. . . The situation with which we are confronted requires a liberality with the pleader he could not otherwise expect . . . [The court] can not construe a series of moving pictures it has never seen." (Citations omitted).

█ Inclusion of telegram. Attached as an exhibit and referred to in the petition is a telegram sent by the Director of the Bureau of Prisons to the President of the ABC network protesting "the totally unfounded implications" of Part One and requesting that Part Two not be shown. "Irrelevant and immaterial" (Numbers 8, 16) and "inflammatory and prejudicial" (Numbers 9, 17) is the attack made. We think the telegram from a public official presumably in a position to know the true facts illustrates the issue of care and also the issue of wilful and intentional defamatory publication.

█ Others. Demurrers contending that evidence is pled (Numbers 4, 11), that allegations are repetitious (Numbers 6, 14) and that the facts pled which are alleged to convey an impression of authenticity are not within the general knowledge of the public (Numbers 5, 12) have been considered, and are without merit.

There was no error in overruling all of the special demurrers.
*Judgment affirmed. Carlisle, P. J., and Russell, J., concur.*