### 49123. MONTGOMERY v. PACIFIC & SOUTHERN COMPANY, INC. et al.

EVANS, Judge.

Mrs. Fred King owned a ten-year-old Volkswagen automobile, and carried it to Montgomery Enco Station for repairs. The repairs were made, and warranted for three months. Montgomery charged $234 for the repairs, which she paid. Eight months later the car needed further repairs, and Mrs. King requested Montgomery to make the further repairs, contending that he was obligated to do so because of the earlier repairs. Montgomery explained that his warranty lasted for three months, and that she had used the car for more than twice that length of time, and that no further repairs were needed until eight months had elapsed. He explained that he would make further repairs, but Mrs. King would have to pay for the new repairs.

Mrs. King then contacted Action Line, a television program conducted by Paul Reynolds, which is carried on Station WQXI-TV in Atlanta. Action Line attempts to secure relief for dissatisfied consumers and customers. It

sent its agent to Montgomery's place of business where he took photographs of other Volkswagens that were there for repairs. A telephone interview was conducted with Montgomery about Mrs. King's complaint. Montgomery explained the situation—that he had made the repairs on Mrs. King's Volkswagen and warranted the same for three months; that the repairs had held up for eight months, and that Montgomery had no obligation to make further repairs, unless he was paid for same; albeit he did agree to give to Mrs. King a discount on any new parts that might be required in the new repair job.

Action Line stated it was going to air the controversy on its television program; Montgomery requested that it not do so, because although he was completely in the clear, some viewers of the telecast might gain the impression that Montgomery was the villian in the plot and was at fault. Despite Montgomery's pleas, Action Line did place the controversy on television—not one time but three times—and thereafter Montgomery suffered a reduction in custom and business.

The broadcast did not at any time suggest that Montgomery was right in his position, but to the contrary, it emphasized how expensive the repairs were, and that Montgomery refused to do the repairs over again without being paid therefor. The final statement on the broadcast was by Action Line as follows: *"This man* has agreed now to do the work for her again, he says, on a cash basis; and *the best he will come up with* is a discount on some of the parts. *Mrs. King, a Volkswagen can be expensive."* (Emphasis supplied.) Webster defines "expensive" as *"high-priced; dear"* and by innuendo it was here suggested that Montgomery over-charged for the repairs at the time they were made.

The only purpose of putting this matter on the air was to illustrate that one of the parties was at fault. It was not an ordinarily newsworthy item, such as an automobile wreck, or a fight. Absent a suggestion that one of the parties was right and one was wrong, it had no news value whatever.

The broadcast was clearly slanted in Mrs. King's favor and against Montgomery. It illustrated how *expensive* were the repairs, and by innuendo the viewers

could easily have concluded that Action Line felt Montgomery had *over-charged* Mrs. King.

The language in the last comment of Action Line, to wit, *"the best he will come up with,"* was suggestive of the idea that Montogmery ought to "come up" with something better. Actually, he had no obligation of any nature as to the latest repairs.

Action Line referred to Montgomery as *"this man"* while referring to the opposing party to the controversy as "Mrs. King." Action Line well knew the name of Montgomery, yet pointed him out as "this man." The very last statement, to wit: "Mrs. King, a Volkswagen can be expensive," in that context, suggested that it was the fault of Montgomery that this particular Volkswagen had proven so expensive. Actually, all automobiles are expensive, and repairs to all cars are expensive. Action Line made it sound as if this particular Volkswagen was the exception to the rule, which was contrary to the facts.

Never at any time during the three broadcasts was Montgomery placed in his proper light. *He had no legal obligation to make repairs a second time; and the repairs he made lasted more than twice as long as he warranted them to last.* But that was never emphasized, and Action Line took care to slant the broadcast against Montgomery.

Montgomery filed suit against Pacific & Southern Company, Inc. and Paul Reynolds, the owner and agent of Action Line, and alleged that they had falsely defamed plaintiff's place of business, vocation and occupation, and had exposed him and his business to public ridicule, without plaintiff's consent; that their acts and conduct were done with malice and intent to injure plaintiff personally and in his vocation and occupation. Defendants answered, and denied the material allegations of complaint and on trial of the case, the trial judge directed a verdict against the plaintiff. Plaintiff appeals to this court. *Held:*

1. This case was decided in defendant's favor on motion for directed verdict. In such cases, all of the evidence and all inferences from the evidence must be construed most favorably toward the party against whom the verdict is directed, which, in this case, is in favor of

the plaintiff. *Royal Blue Transportation Co. v. First &c. Nat. Bank,* 44 Ga. App. 754 (1) (162 SE 879); *McNabb v. Hardeman,* 77 Ga. App. 451, 452 (49 SE2d 194); *Lathan v. Murrah, Inc.,* 121 Ga. App. 554, 557 (174 SE2d 269), s. c., 124 Ga. App. 258 (183 SE2d 496). The statement of facts heretofore made is amply justified under the above legal principle.

2. Defamation by telecast is now actionable by law regardless of whether it be libel or slander. See Code Ch. 105-7, as amended (Ga. L. 1949, p. 1137); *American Broadcasting &c. v. Simpson,* 106 Ga. App. 230 (1) (126 SE2d 873); *WSAV-TV, Inc. v. Baxter,* 119 Ga. App. 185 (116 SE2d 416). In the case of *American Broadcasting &c. v. Simpson,* 106 Ga. App. 230 (1), supra, Judge Homer C. Eberhardt of the Georgia Court of Appeals, coined a new word, now in general use, which is quite descriptive of being defamed by television, to wit *"defamacast."*

3. The broadcasting or publishing of news stories of the happenings in a community in which the public has an interest is a qualified privileged communication unless it relates to matters as to which the law confers an absolute privilege. Code §§ 105-709, 105-712; *American Broadcasting &c. v. Simpson,* 106 Ga. App. 230, supra; *WSAV-TV, Inc. v. Baxter,* 119 Ga. App. 185, supra.

4. A case in which this court has recently reversed the trial court for *dismissal of a complaint* which alleged certain libelous publications, is that of *Thibadeau v. Crane,* 131 Ga. App. 591, and which holds in the First Division: "The trial court was without authority to make a finding of fact that the statements were not false, and genuine issues of material fact remain as to the truth or falsity of the matter complained of." In the above case the question was as to dismissal of the complaint; in the case sub judice, the question is as to directing a verdict in favor of defendant.

5. A publisher of matter is responsible, not only for the actual words published, but for the innuendo that may arise from such words. Words apparently innocent may convey a libelous charge when considered in connection with the innuendo and circumstances surrounding the publication. *Williams v. Equitable Credit Co.,* 33 Ga. App. 441 (1) (126 SE 855); *Davis v.*

*Macon Tel. &c. Co.,* 93 Ga. App. 633 (3) (92 SE2d 619), at pages 633 and 635.

6. Language must be construed, not only by what the speaker intends it to mean, but also by what the average and reasonable reader may *understand* it to mean. *Davis v. Macon Telegraph Company,* 93 Ga. App. 633, 636, supra; *Ingram v. Atlanta Newspapers, Inc.,* 99 Ga. App. 246, 248 (108 SE2d 151).

7. Under the New Pleading Act it is not necessary to specifically allege colloquium and inducement. *Hunter v. A-1 Bonding Co.,* 118 Ga. App. 498 (164 SE2d 246); *Harper v. DeFreitas,* 117 Ga. App. 236 (1) (160 SE2d 260).

8. If a publication of words is susceptible of two constructions, one of which is libelous and the other is not, a jury must determine which one was intended by the publication, as well as which one was understood by the hearers. *Southland Publishing Co. v. Sewell,* 111 Ga. App. 803, 807 (143 SE2d 428); *Davis v. Macon Telegraph Co.,* 93 Ga. App. 633, 636, supra.

9. A contract to pry into and give information concerning the business of another does not create such a public or private duty, legal or moral, as would make a false communication which is injurious to another, privileged. *Johnson v. Bradstreet Co.,* 77 Ga. 172.

10. It is urged that it must be proven that the libelous publication was made with actual malice or with reckless disregard of the truth. New York Times Co. v. Sullivan, 376 U. S. 254 (84 SC 710, 11 LE2d 686, 95 ALR2d 1412); Curtis Pub. Co. v. Butts, 388 U. S. 130, 170 (87 SC 1975, 18 LE2d 1094). But such proof is supplied when the totality of the circumstances suggests malice, and even though the publisher may testify that he acted in good faith (or without malice) "the facts, all the facts, are to be considered in arriving at the truth of his real motive." *Royce & Co. v. Gazan,* 76 Ga. 79, 80 (5); *Childers v. Ackerman Constr. Co.,* 211 Ga. 350 (3) at 354 (86 SE2d 227); *Bowen v. Consolidated Mortg. &c. Corp.,* 115 Ga. App. 874, 876 (156 SE2d 168). It is never expected that the publisher will *admit his own malice.* Likewise it would impose too onerous a burden on plaintiff to expect him to bring forth a witness to testify that he overheard the publisher say that he was actuated by malice. The

*circumstances, all of the circumstances,* must be considered, and from those circumstances, despite the publisher's sworn testimony to the contrary, a jury may properly conclude the publisher was motivated by malice. In this case, at the very least, as was held in the *Butts* case, supra, there was a "reckless disregard of the truth" which is the equivalent of malice.

11. Code § 105-706. In all actions for printed or spoken defamation, malice is inferred from the character of the charge. The existence of malice may be rebutted by proof, which in all cases shall go in mitigation of damages, and in cases of privileged communications it shall be a bar to recovery.

12. As to proof of malice, proof that the writing is false, and that it maligns the *private character or mercantile standing of another,* is itself evidence of legal malice. *Johnson v. Bradstreet Co.,* 77 Ga. 172 (1b); *Lowe v. News Publishing Co.,* 9 Ga. App. 103 (4) (70 SE 607).

13. Publication of a false statement which tends to injure the reputation of another and expose him to public hatred, contempt or ridicule, will be presumed to be a malicious publication; the burden is on the publisher to rebut this presumption. *Horton v. Georgian Company,* 175 Ga. 261 (1) (165 SE 443).

14. It is questionable as to whether this transaction was newsworthy, and whether it was of sufficient importance to the public to warrant its being televised one time (let alone three times), especially in view of Montgomery's request to be let alone and not to publicize the transaction via television. Montgomery was known by Action Line to be in the clear, with no legal or moral responsibility to make repairs after eight months, without charging therefor, as the warranty was for only three months. When Action Line learned the facts, that was a good time to drop the matter. Or, if it persisted with a television show, the purpose should have been to show that for one time the merchant was right and the customer was wrong. It is quite obvious that Action Line's whole purpose was to cast doubt on the workmanship and the integrity of Montgomery and his automobile-repair business. It succeeded all too well, in view of the drastic reduction of plaintiff's customers and business.

15. In the final analysis, the many facets of this case presented questions for solution by a jury, and only by a jury. What was the meaning of the words used by Action Line; how were these words understood by the viewers of the program; what was suggested by innuendo arising from these words; were the words (or the innuendo) true or false; did they suggest matters that were false; what conclusion should be reached from all the circumstances (circumstantial evidence) as to whether Action Line acted with malice or with reckless disregard for the truth? If the words (or the innuendo) suggested falsity, did Action Line introduce any evidence sufficient to rebut the presumption of malice which arises from the publication of false statements of another? After publication by telecast of this situation once, what prompted Action Line to televise the same facts a second time; and thereafter, what prompted it to telecast such a third time?

The trial judge should have submitted the case to a jury and he erred in directing a verdict for the defendant.

*Judgment reversed. Eberhardt, P. J., and Pannell, J., concur.*

ARGUED MARCH 6, 1974 — DECIDED APRIL 11, 1974 — REHEARING DENIED MAY 2, 1974 — 

*Davis & Stringer, Robert H. Stringer,* for appellant.
*Long, Weinberg, Ansley & Wheeler, Ben L. Weinberg, Jr., F. Clay Bush,* for appellees.