## 29013. PACIFIC & SOUTHERN COMPANY, INC. et al. v. MONTGOMERY.

PER CURIAM.

This appeal presents in sharp focus the competing values lodged in two principles: (1) the freedom of the media to publish and broadcast; and (2) the right, not to be damaged by such a publication or broadcast, possessed by an individual citizen.

It is our view that a publication or broadcast, alleged to be a purely private defamation, is not entitled to absolute protection under the "free speech and press" principle.

In this case Mrs. King, a customer, had a dispute with the plaintiff, a repairer of automobiles. She contacted the defendants, a television station and its reporter, concerning her dispute with the plaintiff. The defendants talked with Mrs. King and plaintiff about the dispute; the defendants filmed Mrs. King with reference to her complaint; the defendants filmed the plaintiff's place of business; and the defendants then broadcast the pictures with the following narrative:

"[Reynolds] The lady who called me today has a Volkswagen. It needed repair and is still in the shop and she has a problem. Mrs. King told me her problem. 'What started this problem, Mrs. King?' [King] 'It started back in January, when I had . . . it just would not run; it had a noise in it. I took it out to Montgomery Enco on Clairmont and Briarcliff to see what the problem was and they told me I needed a complete engine job.' [Reynolds] 'So you had it and was it expensive?' [King] 'Yes, it was very expensive. It was $234, that is a lot of money to me.' [Reynolds] 'Where is your Volkswagen today?' [King] 'It is still out at Montgomery Enco. I had to have it taken back for really the same problem. And they refused to fix it.' [Reynolds] 'Well, do they want you to pay all this money again to get your car out?' [King] 'I tried to get Mr. Montgomery to. I let them know that I felt like they should do it free and he said he did not want to talk about it. I said, well, if I gave you the authorization to do the work and was willing to pay for it, how much would it cost me? And he said, I just don't want to talk about it.'

"[Reynolds] 'Mrs. King, we talked to the man at the shop where you had your Volkswagen work done and even though those little, old, small engines are small and are generally dependable, this one is bringing you trouble and you are going to have more trouble with it. He says, there is no way that he is going to repair this engine under warranty, he gave you a three months' warranty and well, the engine did not break down until 8 months. So I guess you're out in the cold there and he is standing by his position. He feels there is no need for him to go back into that engine. He did say that he would discount the parts to you, which will realize a saving of a few dollars to you.'

" 'Well, that is the way it is folks, sometimes those engines are small and sometimes they are dependable and when they are not, they can be very expensive. And Mrs. King's car is going to end up just that — very expensive. This man has agreed now to do the work for her again, he says on a cash basis and the best he will come up with is a discount on some of the parts. Mrs. King, a Volkswagen can be expensive.' "

The plaintiff then brought an action against the defendants in which he alleged that they "wilfully and through collusion and concert of actions with one Mrs. J. Fred King did conspire to expose pictures of the plaintiff's place of business and have Mrs. King appear and express words falsely defaming plaintiff's business, vocation, and occupation, and exposing him and his business to public ridicule without his consent. The acts and conducts by defendants were designed to dramatize a false situation for its own profit, and they did fail to exercise due care to prevent such libel and slander. To the contrary, the defendants encouraged same under the guise of public interest, thereby damaging and destroying plaintiff's business, misusing a privilege merely as a cloak for venting private malice. Defendants knew beforehand what Mrs. King was going to say and do on the television program, and that the words she was to speak against plaintiff's business were false. The broadcast was seen and heard throughout the metropolitan Atlanta area and adjoining counties exposed to the defendants' television system. These acts

and conduct on the part of defendants individually and jointly were done with malice and with intent to injure and damage the plaintiff personally and in his vocation and occupation."

The defendants filed pleadings denying these allegations, the case was tried before a jury, and at the conclusion of the plaintiff's presentation of evidence the trial judge granted a motion for a directed verdict in favor of the defendants. After hearing argument on the motion by counsel the trial judge said: "This court doesn't think that there is sufficient evidence of any untruthfulness on that point alone. The court further doesn't think that the transcript that was presented here in its skit on television met the requirements of defamation. I will, therefore, direct a verdict in favor of the defendant."

The plaintiff appealed to the Court of Appeals, that court reversed the judgment of the trial court (131 Ga. App. 712 (206 SE2d 631)), and we granted the defendants' application for a writ of certiorari to review the decision and judgment of the Court of Appeals.

We agree with the judgment of reversal rendered by the Court of Appeals. The telecast, the pictures and spoken narrative taken in their entire context, together with the testimony of the plaintiff and the defendant news reporter, convince us that the issue of defamation or no defamation was a question of fact for determination by the jury. The trial judge therefore should not have directed a verdict in favor of the defendants.

The plaintiff, answering questions propounded by counsel for the defendants, testified: "Q. Was the car based on your awareness of it and the number of times that '61 car was brought into Montgomery Enco Station between January 8, 1971, and December 1st, 1971, giving Mrs. King trouble for whatever reason? A. Yes, sir, it was giving her some trouble other than the work that we had done on it. Q. Do you think it was going to keep on giving her trouble irrespective of the work you had done? A. As the car itself? Q. The car itself. A. I would imagine a car that old would constantly have maintenance problems — accelerator troubles, brakes and so forth. Q. From a variety of troubles? A. Yes, sir. Q. So this statement in the transcript here that the car is bringing Mrs. King

trouble and she is going to have more trouble with it is true, isn't it? A. The statement you read — if I may read it, please. 'That is the way it is, folks. Sometimes those engines are small and sometimes they are dependable, but when they're not they can be very expensive.' Are you referring to the engine itself? Q. Look on the front page, the one before that, the last paragraph, and let's read this together. 'Mrs. King, we talked to the man at the shop where you had your Volkswagen work done and even though those little, old, small engines are small and generally dependable, this one is bringing you trouble and you are going to have more trouble with it.' That's true, isn't it? A. No, sir. Q. What's wrong about it? You just told us that it was going to keep on bringing her trouble. A. I said the car in general, but not the engine, the one that's been repaired. Q. Was the crankshaft part of the engine? A. Yes, sir. Q. Had she had any trouble with that after the January, 1971 work? A. No, sir. Q. Hadn't she had the crankshaft broken? A. When she brought it in in September, we found it to be broken. Q. Yes, so she had trouble with that part of the engine? A. Sure, that's eight months. Q. That's why I say. After December 1st, 1971, don't you think she would continue to have trouble with the engine of that '61 Volkswagen? And I am not casting any aspersions on your work. A. No, sir, not normally she would not have. Q. Tell us about what is part of the engine and what is not. Are the camshafts part of the engine? A. Yes, sir. Q. Crankshaft part of the engine? A. Yes, sir. Q. Cylinder head studs part of the engine? A. No, sir. Q. The various fuel lines, they are ancillary to the engine, aren't they? A. That's correct. Q. Don't they on a car that old go bad and and give trouble? A. Yes, sir. We replace a lot of fuel lines, fuel pumps. Q. Would you not anticipate that likely to cause trouble in the future in a '61 Volkswagen? A. No trouble to the engine, no, sir. It has nothing to do with the engine at all."

Later, on re-cross examination of the plaintiff by counsel for the defendants, the following was elicited from him: "Q. Do you remember me asking you on your deposition given in Mr. Stringer's office various statements contained in this transcript, plaintiff's Exhibit 2? A. I remember some of it, yes, sir. Q. I want

to read the question on line 2 and I was quoting: 'Mrs. King, we talked to the man at the shop where you had your Volkswagen work done and even though those little, old, small engines are small and are generally dependable, this one is bringing you trouble and you are going to have to more trouble with it.' Please read your answer. A. 'I'd say that was correct.' "

It is obvious that this last answer read by the plaintiff from his deposition taken earlier is in conflict with the plaintiff's actual testimony at the trial quoted above in that the trial testimony explained the deposition testimony, the trial testimony having reference to the engine that the plaintiff had repaired and the deposition testimony having reference to Mrs. King's car in general.

Then on re-direct examination by plaintiff's counsel the plaintiff testified: "Q. And now page 87 as was read to you by Mr.Weinberg. 'Surely. Mrs. King, we talked to the man at the shop where you had your Volkswagen work done and even though those little, old, small engines are small and are generally dependable, this one is bringing you trouble and you are going to have more trouble with it.' A. 'I'd say that was correct.' Q. Tell this jury what you meant by that answer. A. I mean what he read in the question was correct. What was said over the air on the program when he said, 'Mrs. King, we talked to the man at the shop where you had your Volkswagen work done and even though those little, old, small engines are small and are generally dependable, this one is bringing you trouble and you're going to have more trouble with it.' My answer was, 'I'd say that was correct.' That is what was said by Mr. Reynolds to Mrs. King on the program. Q. Did you state whether or not the statement, the contents of the statement were correct? A. No."

The defendant reporter testified on cross examination as follows: "Q. All right, sir, this is still Mrs. King talking: Question: 'I had to have it taken back for really the same problem.' She made that statement? A. Yes, sir. Q. Do you know whether or not she did, in fact, have to take it back for the same problem and what problem she was referring to? A. Yes, sir. Q. And whether or not that statement by her was true and correct? A. Yes,

sir. Q. You know that it was? A. Yes, sir. Q. And how did you determine that, please, sir? A. In conversation with Mr. Montgomery. Q. And she testified: 'And they refused to fix it.' She made that statement on your program? A. Yes, sir. Q. And do you know whether that statement is true or false of your own knowledge? A. Yes, sir. Q. It is true or false? A. It is true. Q. And how did you determine that, please, sir? A. By conversation with Mr. Montgomery. Q. All right, sir, he said that he refused to fix it? A. That it was unfixed. Mr. Weinberg: Excuse me, Mr. Montgomery has already testified that this is true. The court: Let's go on with it a little faster if we can."

This last answer by the defendant shows that the defendants permitted Mrs. King to say on their program, "And they refused to fix it," when the reporter himself knew that the plaintiff had merely said that Mrs. King's car was "unfixed."

Also, the reporter's question in the telecast narrative, asked to Mrs. King, "Well, do they want you to pay all this money again to get your car out?" seems to be a question that is derogatory of the plaintiff and totally without foundation. There is no indication anywhere in the entire investigation that would lead anyone to think that Mrs. King had to pay anything to take her car away from the plaintiff's premises.

In short, whether this telecast was defamatory of the plaintiff on its face, and whether it was true or not pursuant to the testimonial facts elicited at the trial, were issues for determination by the jury.

Slander, or oral defamation, consists of "charges made against another in reference to his trade, office, or profession, calculated to injure him therein." Code § 105-702.

Code Ann. § 105-712 provides that a broadcasting station shall not be liable for any damages for a defamatory statement published or uttered by it unless it is alleged and proved by the complaining party that such station or its agent failed to exercise due care to prevent the publication or utterance of such statement in the broadcast.

Code § 105-708 provides: "The truth of the charge made may always be proved in justification of the libel

or slander."

In this case, whether the defendants were justified in telecasting the matter at issue here should not be determined by the trial court or an appellate court as a matter of law. Justification on the part of the defendants is the only issue in this case, and that issue should be determined by a jury.

The judgment of the Court of Appeals was correct.

*Judgment affirmed. All the Justices concur, except Nichols, P. J., who concurs specially and Undercofler, Jordan and Hall, JJ., who dissent.*

ARGUED SEPTEMBER 12, 1974, — DECIDED NOVEMBER 8, 1974.

*Long, Weinberg, Ansley & Wheeler, Ben L. Weinberg, Jr., F. Clay Bush,* for appellants.

*Davis & Stringer, Robert H. Stringer,* for appellee.

NICHOLS, Presiding Justice, concurring specially.

While I concur in the majority opinion in this case and all that is said therein, in addition this publication is ambiguous.

In *Holmes v. Clisby,* 118 Ga. 820, 823 (45 SE 684), it was held: "The plaintiff cannot by innuendo draw from a writing a conclusion not justified by the language used; but it is competent for the plaintiff to explain in this way an ambiguous publication, to point out the intention of the author, and to show wherein the effect of the language was to injure his reputation. *Park v. Insurance Co.,* 51 Ga. 510. And the rule is that a publication must be construed in the light of all the attending circumstances, the cause and occasion of the publication, and all other extraneous matters which will tend to explain the allusion or point out the person in question. *Colvard v. Black,* 110 Ga. 647. Words harmless in themselves may become libelous when the circumstances under which they are published are such as to convey a covert meaning to the reader reflecting injuriously upon the reputation of the person to whom they refer." The court then distinguished cases where a publication was held to be merely in disparagement of the plaintiff's goods and not a libel to his reputation. A review of the transcript of the broadcast

in the present case shows it to be ambiguous and subject to an interpretation that the plaintiff was guilty of overcharging, did shoddy work and refused to stand behind it, had given a warranty for only three months when a longer one should have been given, that he was retaining possession of the automobile until he was again paid this amount of money whether he did any additional work or not, and even refused to talk to the owner of the automobile.

The facts in this case presented a jury question and it was error for the trial court to direct a verdict for the defendant.

UNDERCOFLER, Justice, dissenting.

"Defamation is made up of the twin torts of libel and slander — the one being, in general, written while the other in general is oral, with somewhat different rules applicable to each . . . In either form, defamation is an invasion of the interest in reputation and good name." Prosser, Law of Torts, (4th Ed.), p. 737. See *American Broadcasting-Paramount Theaters v. Simpson,* 106 Ga. App. 230 (1) (126 SE2d 873). Invasion of privacy is a kindred but entirely different action and is not involved here. Spring, Risks & Rights, 1956, p. 41, § 17.

For many years legal scholars have deplored the absurdities of the libel and slander law and the irreconcilability of the cases. However, there is no dispute that truth is a complete defense except in a few jurisdictions which make some exception. Georgia makes no exception. Code § 105-708. As stated in *Henderson v. Fox,* 83 Ga. 233, 243 (9 SE 839), "[T]he plea [of justification] being established, the action is simply defeated." See also *Savannah News-Press v. Harley,* 100 Ga. App. 387 (1) (111 SE2d 259).

"The theory supporting the rule that truth alone is a defense seems to be that a person is in no position to complain of a reputation which is consistent with his actual behavior and character. Defendant's malicious motives in disseminating the defamatory truth can, accordingly, have nothing to do with the merits of the plaintiff's claim. The real consideration responsible for the rule is the social desirability, as a general matter, of

leaving individuals free to warn the public of antisocial members of the community, provided only that the person furnishing the information takes the risk of its being false." Harper and James, Law of Torts(1956) p.416.

In *Savannah News-Press v. Hartridge,* 110 Ga. App. 203, 206 (138 SE2d 173), Judge Eberhardt said: "If the jury found the article to have been *true,* that should have ended their deliberations, for in that event the defense of justification was sustained and a verdict for the defendant was demanded. Code § 105-708 provides that 'The truth of the charge made may always be proved in justification of the libel or slander.' And it has long been held, both in the Supreme Court and this court that truth is a perfect defense in a civil action for libel or slander. *Cook v. Atlanta Newspapers, Inc.,* 98 Ga. App. 818, 819 (107 SE2d 260); *Henderson v. Fox,* 83 Ga. 233 (9 SE 839). We find no better statement of the law than Judge Townsend's in *Savannah News-Press, Inc. v. Harley,* 100 Ga. App. 387 (111 SE2d 259), 'A libel is a *false* defamation of another (Code § 105-701) and if what is printed is true there is no libel.' '[T]he plea of justification being established the action is simply defeated.' *Ivester v. Coe,* 33 Ga. App. 620, 623 (127 SE 790).

"We suppose there has never been a time since recognition of the action when truth was not an absolute defense. Blackstone asserted: 'Also if the defendant be able to justify, and prove the words to be true, no action will lie, even though special damage hath ensued; for then it is no slander or false tale. As if I can prove a tradesman a bankrupt, the physician a quack, the lawyer a knave, and the divine a heretic, this will destroy their respective actions; for though there may be damage sufficient accruing from it, yet, if the fact be true it is damnum absque injuria; and where there is no injury, the law gives no remedy . . . The truth is an answer to the action, not because it negatives the charge of malice . . . but because it shows that the plaintiff is not entitled to recover damages. For the law will not permit a man to recover damages in respect to an injury to a character which he does not, or ought not, to possess.' McPheerson v. Daniels, 10 B. & C. 263, 272. And in a note to Wyatt v. Gore, Holt N. P. 299, 308, on the matter of justification

it was said: 'The ground of the action on the case for a libel, is the quantum of injurious damages which the person libeled either has, or may be presumed to have sustained, from the libelous matter. It is evident, therefore, that if the subject of the libel, both in its substance and measure, be truly imputed to the plaintiff, that there can be no injurious damage. The reputation cannot be said to be injured where it was before destroyed. The plaintiff has previously extinguished his own character. He has, therefore, no basis for an action to recover compensation for the loss of character, and its consequential damage. The law considers him as bringing an action of damage to a thing which does not exist. Least of all will it allow such a person lucrari ex mala fama.'

"This rule in civil actions was, of course, adopted as a part of our common law and, as we have already indicated, has been so recognized and declared both in the decisions of the courts and in the language of Code § 105-708. It is still the rule, both in England and in the vast majority of the American States."

In the instant case the plaintiff testified that the statements made on "Action Line" were true. There is no evidence of extrinsic circumstances which cause the statements to carry a defamatory meaning. As stated by Prosser, supra, p. 748: "A publication may be defamatory upon its face; or it may carry a defamatory meaning only by reason of extrinsic circumstances. The distinction is not the same as that between defamation which is actionable of itself and that which requires proof of special damage . . . There has been no little confusion as to this, sometimes with unfortunate results. If the defamatory meaning arises only from facts not apparent upon the face of the publication, the plaintiff has the burden of . . . proving such facts, by way of what is called 'inducement.' Likewise, he must establish the defamatory sense of the publication with reference to such facts, or the 'innuendo' . . . The function of the innuendo is merely to explain the words in the light of the facts. No mere claim of the plaintiff can add a defamatory meaning where none is apparent from the publication itself in the light of the inducement . . ." Furthermore, the statements here are not ambiguous.

Dun & Bradstreet v. Miller, 398 F2d 218. As stated in *Park & Iverson v. Piedmont &c. Life Ins. Co.,* 51 Ga. 510, 513, "The office of an innuendo is to explain that which is of doubtful or ambiguous meaning in the language of the publication, but cannot enlarge the meaning of words plainly expressed therein." Here the statements of fact are true, complete and unambiguous. Accordingly, insofar as the statements of fact are concerned there are no false insinuations and the truth of the facts is a complete defense. 53 CJS 233, 275, Libel and Slander, §§ 137, 177; 50 AmJur2d 682, 683, Libel and Slander, §§ 179, 180.

Plaintiff argues that the opinions expressed on "Action Line" are defamatory. "A defamatory communication may consist in a statement of purported fact or in a statement of opinion. The distinction is important in the interest of sound analysis and of practical importance with respect to the defenses of truth, privilege and fair comment. A statement of fact is one capable of the quality of truth or falsity. A statement of opinion does not have this quality. Shortly speaking, therefore, an opinion is never 'true' or 'false' in the same sense as a statement of fact. An opinion is a comment on or an interpretation of fact. It is always related to the facts it purports to interpret. Depending on its conformity with sound critical standards, the opinion may be 'sound' or 'unsound,' 'good' or 'bad,' 'reasonable' or 'unreasonable,' but never 'true' or 'false.' Since opinion or comment is related to a proposition of fact, it is important whether the facts on which it is based are stated or otherwise known or whether they are unknown to the person or persons to whom the opinion is communicated. If they are known, the relationship between the opinion and the facts is apparent. It is subject to examination. On the other hand, if the facts are unknown, the opinion necessarily implies the existence of facts which would support it in the judgment of the person whose opinion is expressed or the person to whom he expresses it. What in form, therefore, is an expression of opinion or judgment is actually, in such a case, an imputation of fact, i.e., facts which would make the opinion a reasonable interpretation thereof." Harper and

James, Law of Torts, 1956, p. 370. "Truth, as a defense, becomes greatly complicated when the defamatory publication consists of statements which are in part statements of fact and in part statements of judgment or opinion. It is said that proof of the truth of the factual statements carries with it a privilege to make such comment thereon as a reasonable man might make." Harper and James, supra, p. 418.

"Defamation is false and injurious statement in an item of fact, not of opinion. The fair expression of opinion, particularly as to matters of public interest, if it is not based upon or does not imply falsehood as to facts, must be permitted in a democratic community. Otherwise free speech and a free press would be ended. . . Those who dislike the opinions so expressed can not be granted the right to complain that they have been defamed, unless the statement of opinion is so intertwined with false statements of fact that the false total stated constitutes defamation. Since opinion shades quickly into fact, the distinction between the two is often difficult to draw." Spring, Risks & Rights (1956), p. 56, § 28.

Here the plaintiff claims that the statements contained in the telecast to the effect that sometimes small engines are not dependable and, when they are not, they can be very expensive and "this one is going to give more trouble" are untrue and will sustain his action for defamation. I do not agree. First, they are expressions of opinion based upon the true facts of the incident and the relationship is apparent. Second, these statements are not directed to the plaintiff but to the engine. The telecast shows the plaintiff warranted the repairs for three months and it was not until eight months later that the engine broke down.

"Action Line" told it all and told it truthfully. There are no "half truths," no ambiguities, and no extrinsic facts which would result in a listener reaching an erroneous conclusion. Its opinions are based on these facts. Consequently, the truth is an absolute defense and the trial court did not err in directing a verdict for the defendant.

Some courts and some legal scholars believe that truth should not be an absolute defense where the

statements are made maliciously and without good motives or justifiable ends. See Ray, Truth: A Defense to Libel, 16 Minnesota L. R. 43. However, Georgia's statutes do not make this exception and until changed by the legislature I must apply the statute as written. Code § 105-708.

I am authorized to state that Mr. Justice Jordan and Mr. Justice Hall concur in this dissent.