## 50504. WASHINGTON v. CITY OF COLUMBUS et al.

STOLZ, Judge.

This case involves an appeal from the Superior Court of Muscogee County following the trial judge's direction of a verdict against the plaintiff and in favor of all defendants after the close of the plaintiff's evidence. The plaintiff's four-count complaint sought a total of $14,000,000 in damages against the defendants, plus costs and attorney fees, for alleged medical malpractice contended to have resulted in the death of the plaintiff's 2-year-old son, for maintaining an inadequate program of instruction and supervision of interns, and for alteration of medical records alleged to have cast a suspicion on the plaintiff of murdering her son. The fourth count is in the alternative for damages arising from the alleged mutilation of the plaintiff's son's body, assuming that the defendants' actions did not cause or contribute to the child's death.

The defendants are: Columbus, Georgia, also known as "City of Columbus, Georgia," Dr. Richard Lowe, Dr. Edward Prieto, Dr. John W. Crosby, and Dr. Sam Miller.

The following evidence was adduced at the trial. In the late morning of January 31, 1971, following several days of illness (T. 219, 291), the plaintiff's 2-year-old son was found by his stepfather on the floor of the plaintiff's bedroom lying motionless (T. 286, 287), apparently without a pulse (T. 287, 300) and not breathing (T. 287). The child did not respond to being called or shaken (T. 299-300). The child was given mouth-to-mouth resuscitation (T. 300) by his stepfather while the plaintiff went to a neighbor's house to call an ambulance (T. 287). Upon arrival of the ambulance, the child was placed on its resuscitator (T. 228), administered cardiac massage (T. 289), and given mouth-to-mouth resuscitation (T. 288) while being carried to The Medical Center, Columbus, Georgia.

Upon the child's arrival at the emergency room, defendant Dr. Crosby, an intern who was assigned to another department of the hospital, but who was at the moment in the emergency room seeing a patient of his (T. 7), observed the child and caused the Cardiac Respiratory

Emergency Alarm to be sounded (T. 9) throughout the hospital, calling all available personnel for emergency assistance. Thereafter, at least four other physicians arrived from other sections of the hospital (T. 10). Those arriving included appellees, Drs. Miller and Prieto, and at least two other physicians not named as defendants in this suit (T. 10). These physicians, together with the assistance of numerous emergency-room nurses (T. 621), performed extensive resuscitative procedures in an attempt to revive the child. All persons present and observing the child during the time the child was in the emergency room, testified that the child was not breathing (T. 590, 594, 596), had no pulse or heartbeat (T. 590, 594, 596, 632), that his pupils were fixed and dilated, and that no blood was in the veins when a vein was incised (T. 64, 65, 76). In sum, there was a complete absence of vital signs. The emergency procedures utilized by these physicians included administering cardiac massage (T. 39), clearing the airways and inserting a trachial tube (T. 11, 623), injecting a stimulant into the child's heart (T. 596, 612, 622), forced breathing (T. 64, 622), and attempting to inject fluids into the child's body intravenously (T. 10, 64, 595-97). During the period of resuscitation, the EKG monitor to which the child was connected showed a continuous straight line, demonstrating that all of the emergency measures pursued did not restore a heartbeat (T. 594). At 12:50 p. m., after having failed to detect any heartbeat, breathing or other signs of life, all five of the physicians present mutually agreed that the child was dead, and the emergency procedures were ordered discontinued. (T. 11-12, 40, 42, 43, 587). At this point, all personnel administering treatment to the child left the room in which the body of the child was located with the exception of appellee Dr. Miller and two nurses (T. 580-81, 629). After noticing a distension of the child's abdomen, Dr. Miller performed a four-quadrant tap on the child's abdomen in an attempt to ascertain the cause of the distension and the cause of death of the child (T. 69, 76, 83). Doctor Miller's plans to perform the taps were never discussed with any of the other physicians (T. 20, 46, 70) and were not performed as the result of the direction or

suggestion of any other physicians. The following day the child's body was taken to the hospital laboratory for an autopsy, which autopsy was performed by a hospital pathologist, Dr. Andres Franco (T. 380). Also present throughout most of the autopsy was Dr. Robert Shuffstall (T. 380), who was the appellant's sole medical witness at the trial.

Dr. Shuffstall, a former pathologist with The Medical Center, testified in substance that his opinion, based upon the autopsy and his subsequent examination of the body and tissues and slides of tissues of the child, was that the child was alive when brought into the emergency room, that the cause of the child's death was intra-abdominal hemorrhage secondary to needle punctures (T. 426), and that the needle punctures causing the hemorrhage were the taps performed by Dr. Miller. The autopsy report prepared by Dr. Franco (T. 924) and concurred in by Dr. Shuffstall (T. 461-463, 503, 506-507, 535), concluded:

"The post mortem findings are as noted in the gross and microscopic descriptions. Based upon these and subsequently received information, the following conclusions are made.

"1. The massive intra-abdominal and retro-peri-toneal hemorrhages are unequivocally due to the four (4) quadrant abdominal taps.

"2. The massiveness and extent of these hemorrhages could not possibly occur in the absence of life.

"3. The specific influence of this [sic] massive hemorrhages in bringing about death in a dying patient is purely conjecture. However, I believe this most likely, served as the final insult.

"4. The basic cause of death remains obscure." *Held:*

1. Defendant Dr. Lowe is alleged to have been negligent in maintaining "an inadequate program of supervision, control, direction, and teaching of Dr. Sam Miller" (R. 43); and in that he, "in an effort to conceal the true facts, attempted to and did [through an unknown person] alter the medical records concerning . . . petitioner's [deceased] minor child," resulting in the plaintiff's coming under suspicion of having caused the death of her child, thus causing the plaintiff "great emotional trauma and stress." (R. 44).

The record shows that defendant Dr. Lowe, the senior, full-time, emergency-room physician on the date of the child's admission to the emergency room, was not present in the hospital due to the day being his "off day." (T. 634). The plaintiff offered no evidence of any duty on the part of Dr. Lowe to train or supervise Dr. Miller. The plaintiff did prove, by the hospital administrator, Mr. Joseph Mitchell, that The Medical Center had a Director of Medical Education for interns (Dr. Cabaniss) and that he and two other full-time hospital physicians (none of the named defendants) were responsible for the hospital's education program to interns. (T. 388, 686). The uncontroverted evidence shows that Dr. Lowe neither was in any way connected with Dr. Miller's making the taps on the plaintiff's child nor knew of nor participated in any alteration of the medical records. (T. 22, 51, 648-649). Likewise, the record conclusively shows that neither Dr. Miller nor Dr. Crosby was assigned to the emergency room. The record fails to disclose any evidence of negligence by Dr. Lowe relating to the incident involving the plaintiff's child. The trial judge correctly granted the motion for directed verdict as to defendant Dr. Lowe.

2. (a) The plaintiff's theory of liability against Dr. Prieto, another full-time physician employed by The Medical Center, was the same as that against Dr. Lowe — the failure to give any sort of training, instruction or supervision to any of the interns prior to the occurrence involving the plaintiff's child. Dr. Prieto was the senior physician present in the emergency room at the time of the admission of the plaintiff's child to The Medical Center and subsequent treatment in the emergency room. Negligence is alleged in his failure to properly supervise the emergency-room rescue effort and failure to detect life in the patient.

As mentioned in Division 1, the plaintiff offered no evidence of any duty or obligation on the part of Dr. Prieto to train and supervise Dr. Miller or any other physician. The plaintiff's own uncontroverted evidence conclusively showed that three other full-time physicians (none of whom were defendants) had the responsibility for the intern education program. The plaintiff's evidence also showed that neither Dr. Miller nor Dr. Crosby, both

interns, was assigned to the emergency room at the time in question. The former was assigned to surgery; the latter was assigned to medicine. Dr. Miller came to the emergency room in response to the Cardio-Respiratory Emergency (CRE) alarm.

(b) Likewise, the record is bare of any evidence that Dr. Prieto had any knowledge of, participated in, caused or ratified the alleged alteration of medical records.

(c) As to Dr. Prieto, the remaining issues relate to the performance of emergency medical procedures upon the plaintiff's child without first having made a diagnosis of the cause of the child's condition and subsequently erroneously determining the child was dead and ceasing emergency treatment.

In our outline of the facts leading up to the child's presence in the emergency room, we have attempted to set out sufficient facts to illustrate the child's condition when he arrived at The Medical Center. The plaintiff's evidence showed that the assistant chief of the rescue squad, who carried the child to the hospital, said, "I have been picking up people for thirteen years and there has never been a deader one than this." (T. 677). The plaintiff's evidence showed the absence of breath (T. 590, 594, 596), pulse or heartbeat (T. 590, 594, 596, 632), circulation (T. 64-65, 76), as well as collapsed veins (T. 64-65, 76, 595). While in the emergency room, the plaintiff's child was given cardiac massage (T. 10, 39, 622), forced breathing (T. 64, 622), Epinephrine or adrenaline shot directly into the heart (T. 596, 612, 622), clearing airway (T. 11, 623), and cut down for medication (T. 10, 64, 595-597, 622). The EKG monitor showed no heartbeat. (T. 594).

"A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." Code Ann. § 84-924.

"A physician can not always effect a cure. He is 'only required to possess and exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by the members of his profession in good standing, and to use ordinary and reasonable care

and diligence, and his best judgment, in the application of his skill to the case.' *Lake v. Baccus,* 59 Ga. App. 656, 657 (2 SE2d 121). Jurors and courts do not know and are not permitted arbitrarily to say what are the proper methods of treating an ailment. This is a medical question. Hence, the general rule is that medical testimony must be introduced to inform the jurors what is a proper method of treating the particular case. 'The court and the jury must have a *standard* measure which they are to use in measuring the acts of the doctor in determining whether he exercised a reasonable degree of care and skill. They are not permitted to set up and use any arbitrary or artificial standard of measurement that a jury may wish to apply.' " *Howell v. Jackson,* 65 Ga. App. 422, 423 (16 SE2d 45). See also *Pilgrim v. Landham,* 63 Ga. App. 451 (11 SE2d 420).

" 'In an action brought by a patient against his physician or surgeon for malpractice, the presumption is that the medical or surgical services were performed in an ordinarily skilful manner, and the burden is on the one receiving the services to show a want of due care, skill and diligence. *Ga. Northern R. Co. v. Ingram,* 114 Ga. 639, 640 (40 SE 708); *Akridge v. Noble,* 114 Ga. 949, 958 (41 SE 78); *Fincher v. Davis,* 27 Ga. App. 494 (2) (108 SE 905); 21 R. C. L. 406; Taylor, Med. Jur. 356. And in such a case the proof ordinarily required to overcome such presumption of care, skill, and diligence is that given by physicians or surgeons as expert witnesses. *Pilgrim v. Landham,* 63 Ga. App. 451 (4) (11 SE2d 420); *Howell v. Jackson,* 65 Ga. App. 422 (16 SE2d 45); 70 C. J. S. 1006-1008, § 62; 41 Am. Jur. 238, § 128." *Summerour v. Lee,* 104 Ga. App. 73, 74 (2) (121 SE2d 80). See also *Shea v. Phillips,* 213 Ga. 269, 271 (2) (98 SE2d 552).

The plaintiff did not offer any evidence in the trial court that any of the emergency room treatment was improperly administered or was not the proper treatment for the plaintiff's child. The plaintiff offered no evidence as to the negligent omission of proper emergency room treatment. Essentially, the plaintiff contends that negligence existed because of the failure to detect life where life existed. This is simply not sufficient to carry the plaintiff's burden of proof. The doctrine of res ipsa

loquitur does not apply in a malpractice case. *Hayes v. Brown,* 108 Ga. App. 360, 366 (3) (133 SE2d 102) and cits. The plaintiff offered no evidence that the diagnosis made as the child entered the emergency room was negligently arrived at. The plaintiff's main witness, Dr. Shuffstall, in response to a hypothetical question encompassing the findings previously attributed to the plaintiff's child's condition (no breath, no pulse, no heartbeat, pupils fixed and dilated, collapsed veins), testified, "you are actually describing a dead child, are you not?" (T. 663). While Dr. Shuffstall testified as to the desirability of having an accurate diagnosis of the cause of a patient's condition prior to treatment, he did not testify that the diagnosis made and the treatment given were not reasonable and proper under the circumstances. Again, negligence cannot be inferred simply because of an unsuccessful result. *Branch v. Anderson,* 47 Ga. App. 858, 860 (171 SE 771). There was no error in the direction of a verdict in favor of Dr. Prieto.

3. Defendant Dr. Crosby, an intern, was allegedly negligent in erroneously pronouncing the plaintiff's child dead, when it was in fact alive; in failing to give appropriate medical treatment; in giving treatment which resulted in her child's death; in altering medical records, causing the plaintiff to become under suspicion of murdering her son; and, in the alternative, being liable for the four abdominal quadrant taps performed by Dr. Miller on her child.

For the reasons set forth in Division 2 (a), (b) and (c), the trial judge correctly directed a verdict in favor of defendant Dr. Crosby.

4. Essentially, the plaintiff's case against Dr. Miller is that he negligently made four quadrant taps in her son's abdomen, which resulted in the child's death; that there was no reason for quadrant taps being made; that the quadrant taps were made without authority or authorization; and, in the alternative, if it should be determined that the child was dead at the time the quadrant taps were made, defendant Dr. Miller would be responsible in damages for mutilating the dead body.

(a) We shall address ourselves to this last-mentioned claim initially. The evidence shows that

the taps were performed by Dr. Miller using a twenty-gauge needle, one and one-half inches in length (T. 69). The police officers investigating the child's death testified that they could not see the "puncture marks" (quadrant taps) when they viewed the child's body in the emergency room. (T. 90, 129, 141). When the body was viewed the next day in the autopsy room, the officer testified that "the puncture marks were very visible and were made about as big as a matchstem or a toothpick or a little bit bigger." (T. 90). The plaintiff did not see the taps (T. 229-230, 246) and in fact did not see her child's body after he entered the emergency room until she saw the body at the funeral home (T. 230, 246). This was after the autopsy had been performed on the child's body (which the plaintiff authorized. (T. 233). In *Rushing v. Medical College of Ga.,* 4 Ga. App. 823 (62 SE 563), a surgeon made a slight incision into the cavity of the abdomen to discover the cause of death. This court held that such did not infringe the right of the deceased's husband to have his wife's corpse in the condition in which death left it where there was no removal of limb or organ, or cutting or mutilating of either. P. 825. The evidence presented in this case simply does not constitute mutilation as a matter of law.

(b) The record does not disclose that Dr. Miller had any authorization to perform the quadrant taps on the plaintiff's child. The evidence conclusively shows that all the physicians and nurses who participated in the emergency room treatment, including Dr. Miller, agreed that the plaintiff's child was dead. (T. 40). Dr. Miller and two nurses remained in the emergency room. (T. 580-581, 629). In making the quadrant taps, Dr. Miller was not attempting to help the patient (T. 81), but "to see what was in the child's abdomen." (T. 83). The evidence showed that quadrant taps are a recognized medical procedure (T. 21, 642) and can be used for diagnostic and therapeutic purposes. (T. 71, 370). Normally, they are not dangerous. (T. 56). Quadrant taps are not designed to puncture the liver (except when used for liver biopsy purposes) or the intestines. (T. 53-55, 646). Dr. Miller testified that he could have inadvertently hit the liver in the performance of the puncture in the right upper quadrant. (T. 74). Dr.

Shuffstall testified that in his opinion the quadrant taps punctured the liver and the intestines (T. 334, 349, 350, 387). Quadrant taps are generally regarded as a surgical procedure (T. 53). Dr. Miller had not been trained to make these taps by the members of the emergency room staff (T. 646), but probably had received such training at some point. (T. 645). The autopsy of the child's body revealed massive hemorrhaging, the presence of leukocytic (repair) cells and blood clots in the punctured areas. (T. 400, 401, 402, 569). As previously mentioned, the autopsy report found that the massive hemorrhages could not possibly have occurred in the absence of life, but their specific influence in bringing about death in a dying patient is purely conjecture, most likely serving as "the final insult," with the basic cause of death remaining obscure.

"[T]he court and the jury must have a *standard* measure which they are to use in measuring the acts of the doctor in determining whether he exercised a reasonable degree of care and skill. They are not permitted to set up and use any arbitrary or artificial standard of measurement that a jury may wish to apply. The proper standard of measurement is to be established by testimony of physicians; for it is a medical question." *Pilgrim v. Landham,* 63 Ga. App. 451 (4), supra. The issue then becomes, whether the evidence in this case was sufficient to establish the medical standard. The defendant strongly insists that it was not. We disagree. Medical testimony, previously referred to, showed that the quadrant taps are a procedure usually performed by a surgeon and are not intended or designed to strike or puncture organs. From this testimony, the jury could conclude that Dr. Miller was negligent in making the quadrant taps on the plaintiff's child. In so ruling, we do not hold or intimate that Dr. Miller was negligent as a matter of law. Nor do we pass upon the consequences of his actions in the event negligence should be found to have existed. The trial judge erred in directing a verdict in favor of defendant Dr. Miller.

5. (a) The plaintiff's suit was initially brought against "City of Columbus, a consolidated government under the laws of the State of Georgia," as a defendant. An

answer was filed on behalf of such defendant, placing in issue the sufficiency of ante litem notice directed to the aforenamed defendant as well as the original complaint citing the proper name being "Columbus, Georgia." The ante litem notice was addressed to "Hon. J. R. Allen, Mayor, City of Columbus, Muscogee County Courthouse, Office of Mayor, Columbus, Georgia, 31901." The last paragraph of the notice stated that it was "submitted to you, the members of the consolidated counsel [sic], the City Attorney and the City Clerk . . . as required by law." The notice itself was sufficient to comply with Code Ann. § 69-308. Substantial compliance is all that is required. The purpose of the notice is to apprise the city of the claim in order that it may determine whether or not to adjust the claim without suit. *Bush v. City of Albany,* 125 Ga. App. 558, 560 (188 SE2d 245). In *Bush,* this court upheld an ante litem notice which omitted the name of the claimant, but was otherwise sufficient. The plaintiff subsequently amended her complaint, making the proper name correction. There is no evidence that "Columbus, Georgia" was in any way prejudiced by the improper designation in the plaintiff's complaint. Columbus, Georgia, was a proper party to the suit.

(b) In addition to the specific denials of the alleged negligent acts by employees of Columbus, Georgia (The Medical Center), the answer of Columbus, Georgia (the City) asserted the defense of governmental immunity. The city's answer alleged that the operation of the hospital was a purely governmental function; that the hospital is not operated for the purpose of making money or as a paying institution, but for the benefit of persons within and without the corporate limits; and, that it has never been operated as a profit-making enterprise. These defenses were re-urged in answers to the amended complaint.

"In an action ex delicto brought against a municipality for injuries alleged to have been sustained in a hospital owned and operated by the municipality, the plaintiff has the burden of providing that the hospital was operated for the special or immediate profit of the municipality. In the absence of such proof a verdict in favor of the plaintiff can not be upheld." *City of Brunswick*

*v. Barrett,* 58 Ga. App. 792 (199 SE 901)."In *Love v. City of Atlanta,* 95 Ga. 129, 133 (22 SE 29) it is stated: 'The preservation of the public health is one of the duties that devolves upon the State as a sovereign power . . . If the State delegate to a municipal corporation, either by general law or by particular statute, this power, and impose upon it within its limits the duty of taking such steps and such measures as may be necessary to the preservation of the public health, the municipal corporation likewise, in the discharge of such duty, is in the exercise of a purely governmental function.' In *Watson v. City of Atlanta,* 136 Ga. 370 (71 SE 664) it was held that the municipal authorities, in operating a non-profit public hospital, were so acting, the court stating: 'The principle of non-liability rests upon the broad ground that in the discharge of its purely governmental functions, a corporate body to which has been delegated a portion of the sovereign power, is not liable for torts committed in the discharge of such duties and in the execution of such powers.' " *Hall v. Hospital Authority of Floyd County,* 93 Ga. App. 319, 320 (91 SE2d 530).

There is no evidence in the record before us that would take the case out of the rule expressed in the cited authorities. Appellant urges that the city is liable under the theory of nuisance, and relies on *Town of Ft. Oglethorpe v. Phillips,* 224 Ga. 834 (165 SE2d 141). This contention fails for two reasons. *First:* The plaintiff's case, as stated in her complaint as finally amended, is based on the negligence alleged in each of its four counts. The theory of nuisance is not mentioned. This latter theory is presented in this court for the first time on appeal. See *Anderson v. State,* 129 Ga. App. 1 (2) (198 SE2d 329) and cits. *Second:* Even if the issue of nuisance were properly before us, the record would not support such a position factually. In the *Town of Ft. Oglethorpe* case, supra, the evidence showed two weeks' knowledge of the defective condition of the traffic light in question which caused numerous collisions (six on the date the plaintiff's case arose) without any effort by the town to correct the situation. The record in the case before us, which we have set out extensively, simply does not show the existence of

a nuisance, knowledge of such by the city, and subsequent failure to correct. The trial judge was correct in directing a verdict in favor of defendant Columbus, Georgia.

6. The plaintiff's fourth and fifth enumerations of error are controlled by our holdings in Divisions 1, 2, and 5 of this opinion.

7. The trial judge correctly denied the plaintiff's motion for new trial as to defendants Lowe, Prieto, Crosby and Columbus, Georgia, but erroneously denied the motion for new trial as to defendant Miller.

*Judgment affirmed in part and reversed in part. Bell, C. J., Pannell, P. J., Deen, P. J., Quillian, Clark, Webb and Marshall, JJ., concur. Evans, J., dissents in part.*

ARGUED APRIL 29, 1975 — DECIDED OCTOBER 30, 1975 — REHEARING DENIED NOVEMBER 21, 1975 — ▮

*Glenville Haldi, R. Joseph Costanzo, William L. Tucker,* for appellant.

*Lennie F. Davis, E. H. Polleys, Jr., Hatcher, Stubbs, Land, Hollis & Rothschild, A. J. Land, Albert W. Stubbs, Kelly, Champion, Denney & Pease, S. E. Kelly, Ernest Kirk, II,* for appellees.

EVANS, Judge, dissenting in part and concurring in part.

The City of Columbus operates a Medical Center. Mrs. Thelma Washington caused her two-year-old son to be entered in the Emergency Clinic of Columbus Medical Center on January 31, 1971. Four different physicians of Columbus examined, treated, or took various actions respecting the child, and the child departed this life.

Mrs. Washington filed suit for malpractice against the City of Columbus and four physicians in Muscogee Superior Court in that they treated and/or failed to properly treat her child and thereby caused his death. After a very lengthy hearing before the trial judge and a jury in Muscogee Superior Court, consuming nine days, the trial judge directed a verdict in favor of the local physicians and the City of Columbus.

Plaintiff filed a motion for new trial, and the trial

judge overruled same. Plaintiff appeals to this court.

The majority opinion affirms the trial court completely except that it says a new trial should be granted only as to Dr. Sam Miller. It is here noted that if the child was alive at the time Dr. Miller performed certain unusual medical experiments on the child's body, this could have caused the death of the child as shown by other expert witnesses. If the child was already dead, then, of course, Dr. Miller caused the "mutilation of the body." I agree to this part of the majority opinion, but I do not agree with the majority in holding the trial judge properly directed a verdict in favor of the other doctors and the hospital. Dr. Miller was merely an intern and was under the control of his superiors and his employer at all times.

I respectfully dissent, and contend the trial court erred in failing to grant new trials against each and all of the defendants; and erred in directing verdicts in favor of the five defendants.

Let it be emphasized that this was a case where *verdicts were directed* after nine days trial, the trial judge thus refusing to allow the twelve jurors of Muscogee County to pass upon the facts alleged against the five Muscogee County defendants.

It is important to remember that we are not here concerned with evidence offered by the defendants, which favored their side of the case; nor are we concerned with the preponderance of the evidence. (However, we do not concede there was a preponderance of evidence in behalf of defendants.) The sole question is: "Was there any evidence, all of which must be construed most favorably towards the plaintiff, which made a factual issue to be passed upon by the jurors? The trial judge had no right whatever to *weigh* the evidence, nor to decide any issue of fact. *Before he could legally direct a verdict for defendants, he must find from the evidence that there was no evidence of any kind supporting plaintiff's position.*" See *Montgomery v. Pacific &c. Co.,* 131 Ga. App. 712, 714 (206 SE2d 631); *Johnson v. Mann,* 132 Ga. App. 169 (207 SE2d 663); *Lathan v. Murrah, Inc.,* 121 Ga. App. 554 (174 SE2d 269); *McNabb v. Hardeman,* 77 Ga. App. 451 (49 SE2d 194).

The gross negligence (malpractice) on the part of the

doctors in this case can be illustrated in a few sentences. When the child arrived at the hospital there was nothing unusual about the appearance of the abdomen; no swelling, no indication that the abdomen was filled with blood. (T. 89) After the child had been in the hospital for approximately 45 minutes those in authority diagnosed that there was no life in the body and the admission records were changed to show *DOA (dead on arrival)!* (T. 43-51, 101, 103, 177, 179, 183-185) The baby was sent to the morgue and left there all night, and the next morning its little abdomen was filled with blood. (See T. 309 to 575) It was proven by experts that the abdomen could not have filled with blood except because of the beating of the heart. (T. 329, 330, 331, 332) So the little child was left alone all night in the morgue — *ALIVE!* (T. 332, 378) — without one iota of attention or aid being administered to sustain life; and as a result, life finally — on the next day — left the little body. (T. 378) Could there be anything more grossly negligent and more indicative of a high degree of malpractice?

A dead child's heart does not beat, and without a heartbeat the child's belly would not have been swollen the next day. At page 332 of the transcript Dr. Shuffstall testified as follows: "Q. Doctor Shuffstall, do you have an opinion as to whether or not the child was alive at the time this quantity of blood, both free blood and blood that was infused into the tissue, was put into the abdominal cavity? A. Are you asking me if I have an opinion? Q. Do you have an opinion? A. Yes, I do. Q. What is that opinion? A. My opinion is that the child was alive."

As previously stated, by no means do I admit that the weight of evidence was with the defendant. When it was proven that they admitted the child to the hospital as a live human being, and then did nothing for him — decided he was dead — when there is ample evidence to show that the child was alive when admitted to the hospital — and then had the records of the hospital *changed* to read "Dead on Arrival," the case becomes quite suspicious and must be considered with the utmost gravity and alertness.

It is impossible to read the record and transcript without becoming thoroughly convinced that there was abundant evidence favoring plaintiff's position and

making issues of fact which should have been determined solely by the jury — not by directed verdicts by the judge. There was ample evidence from which the jury could have concluded that the defendants, each and all, were guilty of malpractice and should have been held responsible and liable.

We shall cite from specific places in the transcript, but first let one of the major issues be set forth. The little child was brought into the hospital (T. 38), and after awhile the physicians considered the child as if *dead* (T. 40). They did not come to this conclusion immediately, and one of the most damning factors in the case against defendants is that *the hospital records were changed after the child had been admitted — someone under those in authority went back and changed the record to show the child was dead on arrival!* (T. 50, 101, 103, 177, 179, 183-185). This comes as near to an admission of guilt as can be imagined against the defendants — to "change the records" after admission of the child as a live and viable human being!

Each and every defendant must accept his full share of responsibility for this shameful act under the evidence and the pleadings, because they were alleged to be "conspirators." Plaintiff's complaint charged that the child's death was "caused by acts of negligence of each of the defendants *acting jointly and separately*" (R. 4 — Count 1 — Paragraph 4); and again it was charged that defendants' "acts of negligence [were committed] while acting jointly and separately." (R. 41, Plaintiff's second amendment to complaint; Par. 4). It was specifically charged that *after the child's admission the medical records were altered* (R. 7, Count 3, Par. 15).

The language used in the complaint is sufficient to charge *conspiracy;* it is not necessary that the word "conspiracy" be used. *Nobles v. Webb,* 197 Ga. 242, 245 (29 SE2d 158); and the conspiracy (as held on the same page) may be shown by *circumstantial evidence.* In *Wall v. Wall,* 176 Ga. 757 (168 SE 893) the last sentence in Headnote 4 is: "Proof of the conspiracy renders the act of one in deceiving and defrauding the injured party *the act of all.*" (Emphasis supplied.)

The complaint alleges that the wrongful acts of

defendants were "jointly" committed, and this is sufficient as to conspiracy. Black's Law Dictionary defines "jointly" as "acting together or in *concert or cooperation.*" Webster's International Dictionary defines "concerted" as "mutually contrived or planned."

And, of course, under the New Civil Practice Act, pleadings are to be given that construction most favorable to the pleader. *Hunter v. A-1 Bonding Service, Inc.,* 118 Ga. App. 498 (164 SE2d 246); *Harper v. DeFreitas,* 117 Ga. App. 236 (160 SE2d 260). In *Girtman v. Girtman,* 191 Ga. 173, 180 (11 SE2d 782), it is held that "there is no magic in mere nomenclature, even in describing a pleading." As to the proof of conspiracy by circumstantial evidence, no actual agreement need be shown. (See *Walden v. State,* 121 Ga. App. 142, 143 (1) (173 SE2d 110)).

In the second amendment to complaint, Count 3, Par. 18 (R. 52) plaintiff charges that the hospital records were altered in order to conceal the true facts.

Dr. Edward Prieto was a full-time physician employed by the Columbus Medical Center. The theory of liability against him was the same as that against Dr. Lowe in that Dr. Prieto failed to give any sort of training, instruction, or supervision to any of the interns prior to this occurrence. Additionally, Dr. Prieto was the senior physician actually present at the time of the emergency treatment of this child and failed to properly supervise the efforts and failed to detect life in the patient.

The Columbus Medical Center was the other defendant. This defendant was charged not only with negligence as a result of the acts of negligence of its (admitted) agents and employees, but was also charged with maintaining a nuisance in failing to properly train, supervise and instruct interns working in the emergency room.

Plaintiff also appeals because a part of her complaint was struck and plaintiff was thus prevented from introducing any evidence in support of such stricken contentions. They are paragraphs 14, 15, 16, and 17 of Count 2 of the amended complaint (R. 51, 52); and allege that Doctors Miller and Crosby were merely interns at the time of their activities in this case, and were not entitled nor allowed to practice medicine except under the direct

supervision of a licensed physician.

The evidence was that the Columbus Medical Center was known as a teaching hospital where young medical school graduates were induced to spend their internship in order to get advanced training. These interns (who are not licensed physicians, but are allowed to practice only under direct supervision) were never given any course of training at all in emergency room procedures except for practical experience. Other departments of the hospital had actual formal training programs, but the emergency room department had none (T. 635-645).

One theory of liability against Drs. Lowe and Prieto and the Columbus Medical Center is that a dangerous situation existed and was allowed to exist (which amounted to a nuisance) in that untrained and inexperienced interns were given full authority to practice medicine without the proper training, instruction *and supervision.*

It is undisputed that the defendant, Sam Miller (the intern who actually punctured the abdomen of the child out of mere curiosity), and John Crosby (the intern who ordered the CRE procedure without even examining the child), had no training or supervisional instruction in the emergency room.

These two interns (as well as all of the other interns at the hospital) could not be licensed to practice medicine until they had completed their one-year internship (Code Ann. § 84-907).

Nothing could be more grossly negligent than to allow interns to practice medicine when the evidence shows absolutely no training, instruction or supervision of these interns and their activities. Sam Miller did not even have a license in January of 1971 and did not make application for any kind of license until July 1971. (Plaintiff's Ex. 20, T. 929)

This evidence was not offered merely to show that Sam Miller was negligent because he was not licensed. It was offered to also show the standard and duty the law imposes on hospitals and hospital physicians who have interns working for them.

I concur in the majority opinion in holding that the court erred in directing a verdict in favor of Dr. Sam

Miller, the intern, inasmuch as it appears from the evidence that he directly or indirectly caused the death of the child; or, if the child at that time was already dead, mutilated its body.

But I dissent from all of the rest of the majority opinion in toto; and assert that the trial court erred in directing a verdict in favor of the five defendants; and that the trial court also erred in ordering certain portions of plaintiff's complaint expunged, and in refusing to allow plaintiff to introduce evidence supporting the contentions thus expunged from plaintiff's complaint.

A new trial should be granted against each of the five defendants, and a jury should decide the question of whether or not defendants committed malpractice and are liable to plaintiff for damages.